Charles H. MEE, Jr., Plaintiff-
Appellee,

v.

SERVICE SPECIALISTS, LTD., an Okla-
homa Corporation, and Edgar E. Kopp,
an individual, Defendants-Appellants.

No. 23–70.

United States Court of Appeals,
Tenth Circuit.

Sept. 24, 1970.

Arnold D. Fagin, Oklahoma City (Fagin, Fagin & Fagin, Oklahoma City, on the brief), for appellants.

R. C. Jopling, Jr., Oklahoma City (Fowler, Rucks, Baker, Jopling, Gramlich & Mee, Oklahoma City, on the brief), for appellee.

Before PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Mee brought this action against Service Specialists, Ltd.,[1] an Oklahoma corporation, and Kopp[2] to recover damages for the alleged breach of an oral contract. The jury awarded Mee a verdict for $8,500. From a judgment on the verdict, the defendants have appealed.

Specialists, at all times herein material, carried on an employment agency business in Oklahoma City, Oklahoma, and also the business of granting franchises to other persons, giving each franchisee the exclusive right in designated territory to use the name, methods and techniques of Specialists in carrying on an employment agency under his franchise and providing for training him in the use of such methods and techniques and otherwise assisting him in carrying on his agency.

Kopp apparently carried on his employment agency and franchise business through Specialists. In his testimony, it was referred to as his company.[3]

On April 19, 1967, Specialists and Mee entered into a franchise agreement. It

---

1. Hereinafter referred to as Specialists.

2. Specialists and Kopp will hereinafter be referred to collectively as the defendants.

3. At the trial, there was no contention made that Specialists was not bound by the oral contract, if it was entered into by Kopp.

recited that Specialists was the owner of a personnel consultant agency in Oklahoma City, Oklahoma; that Mee was desirous of obtaining from Specialists a license to have and use the methods and advantages of a system then being used by Specialists. It provided that for certain recited considerations, Specialists "hereby grants to" Mee "the exclusive right to use the name SERVICE SPECIALISTS, LTD. as a trade name, * * * in connection with an office to be owned by" Mee "in the City of San Francisco and San Pablo Bay areas and parts or all of" nine named counties, as shown on a map attached to the agreement.

It provided that upon the execution of the agreement, Mee should pay "SERVICE SPECIALISTS, LTD." a franchise fee of $3,000 and $2,000 for options to establish two branch offices in the designated territory covered by the franchise. It gave to Mee, in addition to the exclusive right to use the trade name of "Service Specialists" in his main office and branch offices, the "exclusive right to use the methods, techniques, services and advantages of" Specialists.

It further provided that Mee should pay Specialists an override of five per cent of the gross monthly receipts of his business, and that Specialists should furnish Mee assistance in opening up his offices and provide Mee with training in the use of the methods and techniques of Specialists, and also instruction manuals.

Kopp testified at the trial in 1969 that he had engaged in the employment agency business for nine years and in the franchise business for four years.

On April 20, 1967, an addendum to the contract was entered into by Specialists and Mee, which provided that if Mee elected not to open an office in the territory designated in the franchise agreement, he would be entitled to "select a new territory" from the following described territories, "San Diego, California, Portland, Oregon, Seattle, Washington, or Dallas, Texas."

After the franchise agreement had been entered into, Mee spent two weeks in the office of Specialists, receiving part of his training. Mee then went to California to investigate locations open to him under the franchise agreement in that State. He first investigated San Diego and then the San Pablo Bay area, and obtained available information with respect to where the best place would be for the location of his main office, utilizing his former experience as a salesman in a number of different fields.

He spent three weeks in the San Francisco area, two days in San Jose, and the remainder in the City of San Francisco, proper. He then called Kopp and told him that he liked San Francisco. Kopp asked him if he would like him to come out to San Francisco. Mee answered, "Sure." Kopp went to San Francisco about the third week of May 1967. During the forenoon following the night of Kopp's arrival in San Francisco, Mee showed him two office sites he had "picked out" in San Francisco for his principal office. About noon of that day, Kopp said, "Let's go to San Jose." Mee rented a car and they drove to San Jose. They drove around San Jose and visited its Chamber of Commerce, where they obtained some informative material. They discussed the matter of the business location. Kopp said, "San Jose is the place, this is it." Mee said, "Man it sure isn't."

No agreement was reached between Mee and Kopp as to where Mee's main office should be located, and Kopp returned to Oklahoma City. Mee spent another week investigating San Jose and became more firmly convinced that it was not the place to locate his principal office and that San Francisco was the best place. He then returned to Oklahoma City, but he did not contact Kopp until he received a call from Trubey, the Franchise Manager, about June 15, 1967. Trubey requested Mee to come to Specialists' office. Thereupon,

Mee went to such office, and Kopp and he discussed where Mee's main office should be located. They continued such discussions each business day from June 16 to June 26, 1967.

Mee continued to insist that San Francisco was the place to locate his main office and Kopp held out for locating it in San Jose. On June 20, 1967, Mee, for a second time expressed to Kopp his concern about the large agency already located in San Jose and its financial strength. Kopp said, "Don't worry about them, I am behind you," and "I will back you going into San Francisco," if San Jose doesn't work out. Mee continued to express reasons why he did not think San Jose would be a good location for his main office. Finally, on June 26, 1967, Kopp said, "I have been there (San Jose). I have seen it, and I will stake my reputation it is a good town. I will stand the loss and put you in San Francisco if it doesn't work out," and Mee replied, "Okay."

Mee then took additional training in Kopp's agency for a period of four to five weeks.

Mee, in the meantime, caused a corporation to be formed, under the name "Success Unlimited Placement Agency, Inc." [4] He owned all the stock in the corporation and used it as his alter ego in establishing and operating his employment agency in San Jose. He also arranged for a one-year lease on a building in which to house his main office in San Jose.

Mee borrowed $3,632.76 from the Fidelity National Bank in Oklahoma City, with which to purchase furniture for his office in San Jose, evidenced by a note for that amount, secured by a chattel mortgage on the furniture. Success Corporation and Mee were co-signers of the note and mortgage. Kopp executed a writing, by which he guaranteed payment of the note to the bank.

About August 15, 1967, Mee returned to San Jose and prepared to open his main office there in the leased premises. He opened his office about September 15, 1967.

About the end of September 1967, Mee called Kopp and indicated he was not pleased because of the small number of persons coming to his office seeking positions. Kopp told Mee not to worry; that the same thing was happening to him in Oklahoma City. In the third week of October 1967, Mee again called Kopp and again advised him that he was not receiving enough business to cover the amount of money he was paying out for expenses. Kopp replied that his business in Oklahoma City likewise was not good and "not to worry." In November 1967, Mee wrote Trubey that the expenses of operation were higher than he had expected, and business was "going far slower than anticipated and we were quietly beginning to lose our shirts."

Kopp went to San Jose in November 1967. The financial condition of Mee's business was then becoming serious. Up to that time, Mee had not borrowed any money in San Jose. Arrangements were made for a loan of $2,500 from the Bank of America in San Jose. The loan was evidenced by a note signed by Kopp and Success Corporation. Kopp also signed a continuing guaranty in which he guaranteed the payment of that loan and further loans to Success Corporation or to Mee. The guaranty provided, however, that if such loans at any one time exceeded $2,500, the guaranty should not cover the excess.

Mee's agency lost money in November 1967. It lost heavily in December 1967. It broke evenly in January and February 1968. It lost again in March 1968. The result was the insolvency of Success Corporation.

Mee went to Oklahoma City the first part of April 1968, and talked to Kopp. He told Kopp that Success Corporation was insolvent and would have to suspend its operation in San Jose. He reminded Kopp of his oral agreement and asked him what he was going to do about it.

4. Hereinafter called Success Corporation.

Kopp replied that "this was very sudden, and that he wanted to do what was best and that he needed a couple of days to think it over and that he would call" Mee.

Mee lost heavily in the operation of his business in April 1968. In May 1968, he went to Oklahoma City and saw Kopp and told him that he was closing the business down and was going to San Francisco. Mee called Kopp again two or three times in early June 1968. Kopp had promised to pay the two bank notes which he had guaranteed. That promise had been confirmed by Kopp in writing, but Kopp had not kept the promise. On June 15, 1968, Kopp wrote a letter to Mee, reading in part as follows:

"We have talked with the bank and have been informed that you did not make your payments on May 15th or June 15th. We did go ahead and make payments in order for the late charges not to be added for you or us. (The reference was to the furniture note.)

" * * * This is the first failure we have had where we have money invested. Don, Elaine and myself tried every angle, and we feel that due to the tight money situation and to present conditions in general, we are unable to help you any further.

"We are not able to do anything about the bank notes until—

#1. You have surrendered your Franchise to us.

#2. We will now take possession of your furniture, all manuals and all equipment covered by mortgage at the bank on peaceful terms.

" * * * We have done more for you than for any other Franchisee, however, we cannot see our way clear to do anymore.

"*This letter, in accordance with para. 12 of our Franchise Agreement, will give you the thirty (30) day notice to terminate the license granted you as a Franchisee or rectify your default.*"

Mee finally closed the business of his agency in San Jose on August 6, 1968.

Mee was the only person who contributed any money to the capital of Success Corporation.

The evidence shows without any contradiction that Mee personally paid to Specialists the $3,000 franchise fee and the two $1,000 option fees, or an aggregate of $5,000. The franchise agreement recited that the receipt of such sums "is hereby acknowledged." Kopp testified that the balance of the franchise fee and the option fees were paid shortly after the franchise agreement and addendum thereto were executed on April 19 and 20, 1967, respectively.

In April 1967, Mee made an arrangement with the Liberty National Bank of Oklahoma City to borrow on his promissory note, co-signed by his father, $20,000. At the time of the trial, Mee's father had been making payments on the $20,000 note, but Mee did not know the amount of such payments. Mee had not made any payments on that note.

Mee also borrowed $5,000 from his mother, none of which had been repaid at the time of the trial.

Success Corporation borrowed $2,500 from the Bank of America in San Jose. Later, Mee gave his personal note in exchange for the corporate note. At the time of the trial, Mee had repaid one-half of such personal note.

Mee also obtained two $2,000 loans from the Liberty National Bank and advanced the $4,000 to Success Corporation. Such loans have not been repaid.

Mee borrowed $1,300 on a life insurance policy, which was discharged by the cancellation of the policy. He borrowed $2,100 from the Liberty

National Bank, of which he had repaid $700 at the time of the trial. Mee also personally paid $2,517.75 of the furniture note of $3,632.76. Prior to and at the time of the trial, Mee was making payments upon all the unpaid debts of Success Corporation.

All of the moneys borrowed from banks, as above set out, and the proceeds of the insurance loan, were paid over to Success Corporation. They do not include the furniture note to the Liberty National Bank and the $2,500 note to the Bank of America, guaranteed by Kopp, and which Kopp, in a letter to Mee dated July 10, 1968, agreed to pay.

Since the franchise fee and option fees were paid before Success Corporation was organized, and Mee testified that all borrowed money was paid over to Success Corporation and there is no evidence to the contrary, we must assume that Mee paid the franchise fee and the option fees with his own money.

The franchise agreement contained a provision that it should be construed according to the laws of Oklahoma.

Counsel for the defendants contended that the oral contract, if made, was one of indemnity, and that Mee's recovery was limited to the amount he had repaid on the borrowed money. They requested the court to instruct the jury that if it found the oral contract was entered into, Mee's recovery should be limited to the amount of the borrowed funds he had repaid.

15 Okl.St.Ann. § 421 reads as follows:

"Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."

15 Okl.Stat.Ann. § 427 reads in part as follows:

"In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:

"1. Upon an indemnity against liability, expressly, or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable.

"2. Upon an indemnity against claims or demands, or damages or costs, expressly, or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof."

The proceeds of the loans, when paid over to Mee, became his property, and he was free to use them in the establishment of his main office and in conducting his employment agency.

■ The oral contract was not a contract to indemnify Mee against liability for the loans, or any one of them, nor was it a contract to indemnify Mee against claims or demands, or damages or costs. It was a contract to pay an ascertainable amount upon the happening of a future event, which in fact occurred.

■ The meaning of a contract should be arrived at by determining the intention of the parties thereto, upon a consideration of the attendant circumstances, the position of the parties, and the purpose of the contract.[5]

Kopp's objective when he made the proposal to Mee, which on the latter's acceptance brought into being the oral contract, was to induce Mee to locate his main office and operate his employment agency, under the franchise, in San Jose, rather than in San Francisco, where Mee wanted to locate such office and operate such agency.

5. Roosevelt Materials Company v. Nolan Brothers, Inc., 10 Cir., 264 F.2d 807, 809; Cities Service Gas Co. v. Kelly-Dempsey & Co., 10 Cir., 111 F.2d 247, 249; Liberty Nat. Bank & Trust Co. v. Bank of America Nat. Trust & Savings Ass'n., 10 Cir., 218 F.2d 831, 840.

We are of the opinion that, considered in the light of the attendant circumstances, the position of the parties, and the objects to be obtained by the oral contract, the intention of the parties thereto was that if Mee opened his main office in San Jose and carried on his employment agency there, under the franchise, and such operation was financially unsuccessful and resulted in losses, Mee would be permitted to open another main office in San Francisco and operate his employment agancy there, under the franchise, and to the extent moneys expended by Mee or his alter ego, Success Corporation, in the installation of the main office and the operation of the employment agency in San Jose were lost, Kopp would stand the loss and pay to Mee the amount of such loss, so that Mee would have sufficient operating funds to open and maintain a main office and carry on therein his employment agency business, in San Francisco.

Obviously, the right to establish a main office in San Francisco and operate an employment agency therein, under the franchise, would be worthless to Mee, unless he had the necessary working capital so to do. It seems clear to us that the promise of Kopp to stand the loss was to assure Mee that his working capital would not be impaired by the loss of moneys expended in locating his main office and operating his employment agency at San Jose, should such loss occur, but would be restored by the payment of the amount of such loss by Kopp to Mee.

By the breach of the contract by the defendants and the cancellation of the franchise agreement by them, Mee lost the amount he had paid personally to Specialists for the franchise fee and the two option fees. Such amount, in addition to the amounts of the loans repaid by Mee, exceeded the amount of the jury verdict. Therefore, the defendants suffered no injury, even if they are right in their contention that the contract was one of indemnity. However, we adhere to our position that it was not an indemnity contract.

Accordingly, the judgment is affirmed.