Peter **CHALAMIDAS** and Elizabeth **Chalamidas, Plaintiffs–Appellants,**

v.

**SIERRA LIFE INSURANCE COMPANY,**
an Idaho Corporation,
**Defendant–Appellee.**

**No. 79–1026.**

United States Court of Appeals,
Tenth Circuit.

Argued July 9, 1980.

Decided Sept. 8, 1980.

---

Frederick B. Howden, Grants, N. M., for plaintiffs–appellants.

Robert Suzenski, Santa Fe, N. M. (Fred M. Standley, Santa Fe, N. M., with him on the brief), of Standley & Suzenski, Santa Fe, N. M., for defendant–appellee.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a diversity action in which Peter Chalamidas and his wife Elizabeth seek damages for breach of contract. The defendant is Sierra Life Insurance Company, an Idaho corporation. The covenant in the contract which is the embattled one is that which undertook to give notice to plaintiffs of an impending sale of an apartment house which plaintiffs had conveyed to Sierra. This was to provide the plaintiffs with a right of first refusal (to buy the complex). Sierra sold the property without giving notice, but the contention is that this was waived or merged in prior dealings between the parties.

This transaction goes back to November 9, 1971 when the Chalamidases purchased the apartment complex. It was a one hundred unit federal financed low–income project called the Orleans Manor which was located in Gallup, New Mexico. Plaintiffs had participated in the promotion and development of the complex, and at the time they had commenced to rent it out.

This was not the solitary project which the Chalamidases handled for Sierra. During this same period, on June 14, 1971 they had purchased a motel from Sierra in Albuquerque. This was known as the Western Skies Motor Hotel. The purchase price was $4,000,000.00 all in notes signed by the plaintiffs and secured by the motel.

At the beginning of 1972 the plaintiffs were in default in their payments to the defendant on the Western Skies purchase. In March Sierra notified plaintiffs of the default. Negotiations were commenced between plaintiffs and the attorney for Sierra. These sought a formula for curing the default. The result of the negotiations was an agreement for payment. The date of this was April 13, 1972. This contract required plaintiffs to transfer to defendant eight lots in Grants, New Mexico, 55,000 shares of stock in Pig 'n Whistle Holding Corp. In addition some $13,000.00 in cash was paid by plaintiffs to defendant. Further collateral was given which consisted of the proceeds of life insurance on Mr. Chalamidas' life. The balances due were adjusted and extended.

Soon thereafter, on May 5, 1972, the parties entered into two additional agreements. One of these was a contract for the purchase of Orleans Manor. Sierra agreed to purchase this by assuming the outstanding indebtedness to the Federal Housing Ad-

ministration in the sum of $1,224,585, and by agreeing to pay an additional $310,000 for plaintiffs' equity. The agreement further provided:

"Buyer agrees that Sellers shall have the first right of refusal should the Buyer determine to sell the said property being acquired hereby, until December 31, 1975, that is the Buyer shall communicate to the Sellers any bona fide offer to purchase the same and the Sellers shall have 15 days after written notice to give written notice of their intention to purchase the same within 30 days from the original written notice by the Buyer to the Sellers."

Although the legal effect of this paragraph supports creation of an equitable interest in the property on the plaintiffs' behalf, no such argument has been made in the trial court or in this court. No evidence appears in the record of the intention of the parties in including the paragraph.

Also executed by the parties on May 5, 1972, was a side agreement, entitled "Agreement Regarding Purchase" which provided for the application of the $310,000 purchase price "paid" to the plaintiffs for equity in the Orleans Manor. These proceeds were almost entirely applied to credits on past and future payments on the Western Skies purchase, "repurchase" by plaintiffs of the Pig 'n Whistle stock, contribution of cash to pay taxes and accounts payable of the Western Skies and as payment for physical improvements and working capital for the Western Skies.

The plaintiffs were again in default in their payments on the Western Skies during the Fall of 1972. The parties at that time entered into lengthy negotiations and several agreements in an attempt to resolve the situation. The parties were aware of the concern of the Insurance Commissioner of the State of Idaho as to Sierra's problem that the properties which were listed as assets of Sierra did not in law qualify as investments under Idaho law. Negotiations continued during 1973, as did plaintiffs' defaults. Finally on January 17, 1974, the parties entered into an "Agreement to Reconstitute Secured Debt" bearing an effective date of January 1, 1974, in which the plaintiffs acknowledged their indebtedness in the amount of $4,252,816.65, acknowledged their default in repayment of this debt, and agreed also to their inability to cure said default. This agreement called for the execution by the plaintiffs of a renewal note payable to the defendant plus warranty deeds conveying the Western Skies property and six other parcels of real estate to a wholly owned subsidiary of Sierra, as trustee. This trustee was to hold title subject to written notice from Sierra of plaintiffs' default, together with instructions from Sierra to deed over a part or all of the properties to Sierra which would then credit plaintiffs' indebtedness in agreed amounts.

The agreement further provided in Paragraph 17:

"That upon execution hereof and upon execution of the related warranty deeds and note, all prior contracts, agreements, notes, mortgages, deeds of trust and other instruments shall be deemed void and of no further force and effect, except all security agreements, financing statements and assignments of leases and licenses that provide Sierra with a first lien security in the furnishings, fixtures, equipment, work in process, inventory of merchandise and supplies, accounts receivable, and all other personal property appurtenant to the Western Skies Motor Hotel shall remain valid and in full force and effect, constructively running from the trustee as assignee of Chalamidas in favor of Sierra. That all other real estate previously mortgaged to Sierra by Chalamidas, that has not been previously sold and conveyed to Sierra by Chalamidas or transferred to the trustee pursuant to this Agreement, is released to Chalamidas as their separate property."

In April of 1975, Sierra entered into a contract for sale of the Orleans Manor to a

third party.[1] Included in the sale was an additional 3.98 acres of land adjacent to the apartment complex. The purchase price was $1,500,000. At trial the plaintiffs submitted opinion evidence that the fair market value of the apartment complex at the time of resale was $1,675,676 and that the value of the adjacent land was $20,000 per acre. It was uncontested at trial that the defendant gave no written notice of an offer to purchase or of Sierra's intention to sell the Orleans Manor. The trial court found that the plaintiffs had actual notice of the defendant's intention to sell the complex to third party buyers, and this finding is not being challenged here.

On July 1, 1977, plaintiffs brought this action for breach of contract in the state courts of New Mexico. Compensatory damages were sought in the amount of $1,000,000 together with punitive damages in the amount of $100,000. The entire action was based upon the failure of the defendant to give notice of the pending resale whereby plaintiffs could exercise their claimed "right of first refusal." The action was removed on the petition of the defendant, to the United States District Court for the District of New Mexico and on August 31, 1978 it was tried to the court, (H. Vearle Payne, District Judge).

The trial court found, *inter alia*, that the Western Skies operated at a loss for each of the years between 1972 and 1975 and did not increase in value between May 5, 1972 and December 31, 1975. It further found that the plaintiff Peter Chalamidas entered into the January 17, 1974 "Agreement to Reconstitute Secured Debt" with knowledge that it was intended to include the Orleans Manor purchase agreement in the category of prior contracts and agreements declared to be void and of no effect by Paragraph 17. The court concluded that

the Orleans Manor purchase contract "became merged" into the agreement of January 17, 1974, and that the first right of refusal to repurchase the apartments was "extinguished and rendered void and of no further force and effect". The trial court dismissed the plaintiffs' complaint and ordered judgment to enter in favor of the defendant.

On this appeal the plaintiffs do not challenge the validity of their transactions with Sierra.

Their principal contentions are first, that the trial court erred in finding that the contract for purchase of the Orleans Manor was intended by the parties to be included in the 1974 "Agreement to Reconstitute Secured Debt," among the transactions described as "all prior contracts, agreements, notes, mortgages, deeds of trust and other instruments," which were deemed to be void by the provisions of Paragraph 17.

Plaintiffs further contend that the trial court erred in declining to find the fair market value of the Orleans Manor at the time of its resale. Third, that the plaintiffs' knowledge of the defendant's intention to resell the apartment complex does not constitute notice in compliance with the terms of the first right of refusal.

Plaintiffs concede that the latter two issues are moot if this court affirms the trial court's findings and conclusions relating to the integration of the Orleans Manor contract into the agreement of January, 1974.

Plaintiffs argue that the 1974 agreement which they characterize as the "Western Skies contract," was intended by the parties to apply to, and to discharge, only those contracts and agreements pertaining to the Western Skies purchase and indebtedness, and not the May, 1972 agreements relating to the purchase of the Orleans Manor.[2]

---

1. The trial court found that a sale was held after January 17, 1974, but prior to December 31, 1975. The contract called for possession and closing on May 1, 1975.

2. Plaintiffs further allege as error the trial court's consideration of all extrinsic evidence of the circumstances leading up to the 1974 contract as inadmissible "parol evidence". The plaintiffs did not object to the admissibility of

The trial court expressly found that the contract of purchase of the Orleans Manor was intended to have been integrated into the 1974 refinancing of plaintiffs' debts to the defendant, which debts were secured by the Western Skies and other properties. This finding is supported by the Agreement Regarding Purchase, Defendant's Exhibit D, which was executed concurrently with the contract of purchase of the Orleans Manor. It thus includes the Orleans Manor liabilities as well as those of Western Skies. It was intended to insure that the proceeds which defendant was to pay to the plaintiffs for the plaintiffs' equity in the Orleans Manor would be applied to the purchase and operating expenses of the Western Skies. The 1974 agreement therefore purports to "reconstitute" the plaintiffs' indebtedness to defendant, further reorganization of the collateral by requiring the transfer to a "trustee", a wholly owned subsidiary of the defendant, of properties having an agreed value of $4,757,200 to "secure" an indebtedness of $4,275,000.[3]

Similarly correct is the trial court's finding that the 1972 agreement, which contains the first right of refusal clause, was discharged. Although termed a "merger" of the prior agreement into the later, January, 1974 agreement, the transaction is more accurately classified as a novation or substituted executory contract which discharges the prior agreement by substitution. See 6 *Corbin on Contracts*, § 1297. Cf. *A to Z Rental, Inc. v. Wilson*, 413 F.2d 899 (10th Cir. 1969). As observed in *Corbin*, "It is a question of interpretation how far

the new agreement operates as a discharge and how many antecedent claims are included and discharged." 6 *Corbin on Contracts* § 1293, citing *Broadhurst v. Whitelock*, 313 F.2d 130 (10th Cir. 1962). In making this interpretation the trial court properly considered extrinsic evidence, *Aboussie v. Aboussie*, 441 F.2d 150 (5th Cir. 1971) including the purpose of the contract, *Mee v. Service Specialists, Ltd.*, 432 F.2d 30 (10th Cir. 1970) and the general surrounding circumstances. *East and West Insurance Company of New Haven, Conn. v. Fidel*, 49 F.2d 35 (10th Cir. 1931); *First National Bank in Dallas v. Rozelle*, 493 F.2d 1196 (10th Cir. 1974); *Broadhurst v. Whitelock, supra.*

There is substantial evidence in the circumstances surrounding the 1974 agreement to indicate that that agreement was intended to resolve all outstanding transactions between the parties. The plaintiffs had been in continuing default in their several dealings with the defendant. The thrust of the agreement is to transfer as much additional collateral as possible to the defendant without the necessity of a public trustee's foreclosure. It would be highly unlikely that the parties intended to exclude from the discharge clause the plaintiffs' equity, if any remained, in the Orleans Manor, which was characterized by the negotiating attorney for the defendant as the largest single transaction between the parties and the "most integral part of the entire process." The same attorney testified that he personally reviewed with plaintiff Peter Chalamidas every agreement en-

any of this evidence at trial and we therefore do not consider it as being erroneously received. Rule 103(a)(1), *Federal Rules of Evidence, International Union of Operating Engineers v. Central National Life Insurance Company*, 501 F.2d 902 (10th Cir. 1974).

**3.** Given the facts of the plaintiffs' continuing defaults, the unprofitability of the various ventures, and the continuing requirement that the transactions be further collateralized, the 1974 agreement might be in the nature of a forfeiture of the properties rather than a refinancing. The agreement, plaintiffs' Exhibit 3, is attached as an appendix to this opinion. Its validity has

not been called into question in this action, cf. 6 *Corbin on Contracts* § 1293 and we do not consider it. The parties presented the various agreements for their face value, and the trial court was not required to exercise initiative as to the true purposes of the transactions between these parties. Since there is no evidence in the record as to the true nature of the contracts, further comment would be speculative. We cannot however refrain from observing that the transactions were more than arms–length dealings between independent businessmen.

tered into between the parties, perhaps twenty or more documents, which included the Orleans Manor documents prior to the execution of the January, 1974 agreement. The 1974 agreement operates as a substituted agreement, which, by its terms discharges all prior agreements, and by its implication, concerns prior agreements *between the parties* thereto. It therefore operates as a discharge of the plaintiffs' first right of refusal.

Finally the complexity and conflicting nature of these parties' dealings preclude grant of relief for such a relatively miniscule matter as the failure to extend a right of first refusal.

The remaining issues raised by the plaintiffs are therefore moot, and the judgment of the trial court is affirmed.

### Exhibit A
### AGREEMENT TO RECONSTITUTE SECURED DEBT

AGREEMENT, entered as of this 1st day of January, 1974, by and between Peter Chalamidas and Elizabeth Chalamidas, husband and wife, hereinafter called "Chalamidas", and Sierra Life Insurance Company, an Idaho corporation, hereinafter called "Sierra".

WHEREAS, Chalamidas is indebted to Sierra in the agreed amount of $4,252,-816.56, said debt being secured by certain real estate situated in the state of New Mexico and evidenced by a Deed of Trust dated June 15, 1971, with the First National Bank In Albuquerque, Albuquerque, New Mexico, Trustee; and

WHEREAS, Chalamidas is in default in the payment of said debt and cannot presently cure said default; and

WHEREAS, the parties hereto desire to provide a method by which said default can be cured and said debt paid by Chalamidas, but additionally securing Sierra in the premises and providing for a procedure whereby Sierra or Chalamidas may cause the security for said debt to be sold, in whole or in part, with the proceeds to be applied to the satisfaction, in whole or in part, of the reconstituted debt; and

WHEREAS, the parties desire for Chalamidas to continue to operate until sold a certain motor hotel partially securing said debt, known as the Western Skies Motor Hotel, Albuquerque, New Mexico, and to receive the income, rents and operating profits from all of the real estate securing said debt, and Sierra desires to presently aid Chalamidas in the operation of said motor hotel by providing funds for the payment of certain capital improvements of said motor hotel;

BE IT THEREFORE AGREED:

1. That Chalamidas shall paid (sic) said debt in full by executing their promissory note to Sierra in the amount hereinafter specified, thereby paying by renewal all notes and debts owed to Sierra, said renewal note to be payable as to principal and interest pursuant to the terms thereof, as set forth hereinafter, a copy of said note being attached hereto as Exhibit A.

2. That said renewal note shall be secured by the title to certain real estate set forth hereinbelow and presently mortgaged to Sierra by Chalamidas. That in this regard Chalamidas shall transfer, by warranty deed, title to the real estate specified hereinbelow to Western Skies Corporation, a New Mexico corporation, a wholly owned subsidiary of Sierra, which shall act as trustee for the parties hereto.

3. That the said trustee shall hold legal title to said real estate conveyed thereto, and shall not pledge, mortgage or transfer said real estate to any person except as specifically authorized in this Agreement or upon the mutual instructions of the parties hereto. That the said trustee shall not be responsible for the payment of any taxes, fees, insurance or any other expenses related to said real estate or businesses conducted thereon, the same to be paid by Chalamidas as hereinafter provided.

4. That Chalamidas remains equitable owner of the real estate conveyed, under

the terms of this Agreement, until the same has been sold or the debt securing the same paid, unless the same is conveyed to Sierra or its assigns in satisfaction of debt upon default by Chalamidas of any payments provided for in said renewal note or upon the breach by Chalamidas of any terms of this Agreement.

5. That Chalamidas shall receive and retain as their separate property all rents, income and profits derived from the said real estate transferred, and any businesses located thereon during the time that the real estate is held by the trustee. That Chalamidas shall timely pay when due all real estate taxes, assessments, fees and other expenses incidental to the ownership of said real estate and shall keep said real estate fully insured against all perils, including but not limited to fire and extended coverage loss, in an amount equal to the value of the improvements located on said real estate as specified hereinbelow, with Western Skies Corporation named as loss payee. That in the event of such loss, the trustee shall cause the damaged premises to be restored from the proceeds of such insurance, or otherwise pay such funds as mutually instructed the parties hereto.

6. That Chalamidas shall have and exercise full operational authority of said real estate transferred and shall keep all improvements on all of the real property transferred in good repair and condition at their sole expense. That in regard thereto, agents for Sierra have the right to enter any real estate and inspect such improvements at all reasonable times to determine compliance herewith.

7. That the real estate to be transferred to the trustee by warranty deed is generally described as follows, the legal descriptions thereof set forth in Exhibit B through D, being copy of warranty deeds, with the agreed value of land, improvements, and the amount securing said debt set forth opposite the general description of each parcel:

| Parcel | Value of Land | Value of Improvements | Amount Securing Debt |
|---|---|---|---|
| Western Skies Motor Hotel and Adjacent Property (Exhibit B) | $650,000.00 | $3,635,000.00(1) | $3,856,500.00 |
| All States Court Property (Exhibit C) | 186,300.00 | — | 139,725.00 |
| Farmers Barn Drive-In Restaurant (Exhibit C) | 91,900.00 | 80,000.00 | 128,925.00 |
| 2 Lots in the Williams Addition, Gallup (Exhibit C) | 14,000.00 | — | 10,500.00 |
| Amended Chalamidas Subdivision (Exhibit D) | 40,000.00 | — | 30,000.00 |
| One-half interest in R. B. Candelaria Property (Exhibit D) | 40,000.00 | — | 30,000.00 |
| One-fourth interest in State Highway No. 53 Property (Exhibit D) | 20,000.00 | — | 15,000.00 |
| Sub-Total | | | $4,195,650.00 |
| Value of furnishings, inventories, license, etc., as specified hereinbelow | | $ 115,000.00 | 79,350.00 |
| Total Securing Debt | | | $4,275,000.00 |

(1) Includes installed equipment, fixtures and furniture.

8. That in addition to the real estate transferred, Chalamidas, and the Midas Corporation owned thereby, hereby sell, assign and transfer to the trustee all furnish-

ings, supplies, foods, liquor, goods and all other personal property located at the Western Skies Motor Hotel and utilized in the operation of said motor hotel, together with the liquor license standing in the name of Chalamidas or the Midas Corporation, all having an agreed value of $115,000.00 and securing the remainder of said debt in the amount of $79,350.00. That in regard hereto, Chalamidas may use and expend all supplies, goods and all other personal property located at the Western Skies Motor Hotel in the normal operation thereof and without restriction, provided that such use and expenditure is consistent with prudent management and operating practices of hotels and motels and that Chalamidas shall maintain an inventory of such supplies, foods, liquor, goods and other personal property at the present levels and amounts thereof. That, further, the liquor license transferred hereby shall remain in the name of the present licensee until such time as demand for its transfer is made by Sierra pursuant to the further terms of this Agreement.

9. That the renewal note shall be in the amount of $4,275,000.00, comprised of $4,252,816.56 total debt due Sierra by Chalamidas on December 31, 1973, and for cash in the amount of $22,183.44 advanced Chalamidas on the date of execution hereof for payment of improvements recently made to the Western Skies Motor Hotel, the receipt thereof acknowledged by Chalamidas. That the same shall be payable in full on January 2, 1979, with interest payable for five (5) years as follows:

a. Commencing on June 1, 1974, monthly at the rate of four per cent per annum through January 1, 1975, being nine payments of $14,248.58;

b. Commencing on May 1, 1975, monthly at the rate of five per cent per annum through January 1, 1976, being nine payments of $17,812.22;

c. Commencing on May 1, 1976, monthly at the rate of seven per cent per annum, through January 1, 1977, being nine payments of $24,937.36;

d. Commencing on May 1, 1977, monthly at the rate of nine per cent per annum, through January 1, 1978, being nine payments of $32,062.07; and

e. Commencing on May 1, 1978, monthly at the rate of ten per cent per annum, through January 1, 1979, being nine payments of $35,624.86.

10. That in the event of any default in the performance of the terms of this Agreement or the payment of said renewal note by its terms, and such default is not cured within twenty (20) days after written notice from Sierra to Chalamidas, the trustee upon instructions of Sierra shall deed all or any part of said real estate to Sierra or its assigns, with Sierra crediting the debt owed by Chalamidas in the amount securing said debt as set forth in paragraph 7 hereof, with Chalamidas to vacate the real estate transferred within ten (10) days after notice of such transfer, said real estate transferred, together with all improvements thereon, thereafter to be the sole and separate property of Sierra or its assigns.

11. That Chalamidas may at any time prior to the transfer of a particular parcel of real estate pursuant to the provisions hereof acquire from the trustee full legal title to any parcel of real estate transferred to the trustee by paying to Sierra in cash the amount securing said debt of any parcel as set forth in paragraph 7 hereof, with Sierra to credit the debt owed by Chalamidas in the amount paid, thereby reducing the principal owed and the amount of interest per payment owed, provided if Chalamidas so acquires the Western Skies Motor Hotel they must also acquire the supplies and liquor license at a price equal to the amount securing said debt for such supplies and license.

12. That Chalamidas may at any time prior to the transfer of a particular parcel of real estate acquire all real estate, supplies and license assigned by delivering to Sierra valid and bona fide industrial, rail, utility or government bonds that are free and clear of all liens and encumbrances, not

in default, that have a par value equal to the principal amount of the debt and all interest owed Sierra by Chalamidas, and rated BBB or higher by standard and Poor Bond Ratings, having a minimum interest rate of five (5%) per cent per annum and a maximum maturity year of 2004, with the amount of any one issue not to exceed $750,000.00 par value. That after reasonable notice to Sierra and tender of such bonds, Sierra shall inspect such bonds and if in proper order shall accept the same and shall cause the trustee to transfer to Chalamidas or his assigns full and complete title to all real estate held by it, and Sierra shall constitute the debt of Chalamidas to it paid in full.

13. That Chalamidas may acquire only the Western Skies Motor Hotel, adjacent property and all supplies and license from the trustee, for their own account or for sale to another, by delivering valid and bona fide bonds to Sierra, of the same identical type specified and by the same procedure set forth in paragraph 12 above, having a total par value of $4,000,000.00, with the debt of Chalamidas owed Sierra credited after delivery and acceptance of said bonds in an amount equal to the amount securing said debt by the said hotel property and supplies. That should Chalamidas elect to exercise this provision, after delivery and receipt of said bonds, Sierra will, at the request of Chalamidas, at any time prior to said note becoming due, if not in default, refinance the remaining debt owed and secured by the remaining real estate on a twenty (20) year self amortizing note, payable monthly and bearing interest at the rate of seven (7%) per cent per annum, containing the usual insurance, taxes, default and collection clauses.

14. That Sierra may sell, cause to be sold, or take for its own account any or all parcels of real estate transferred to the trustee, except the Western Skies Motor Hotel and adjacent property, at any time upon thirty days written notice to Chalamidas, by crediting an amount equal to the appraised value of any such parcel sold or taken as set forth in paragraph 7 against the debt owed it by Chalamidas, thereby reducing the principal amount owed it by Chalamidas and reducing the monthly interest payments due it to an amount equal to the rate of interest computed on the then remaining balance. That during the said thirty day notice period, Chalamidas may acquire said parcel being sold or taken by Sierra pursuant to the provisions of paragraph 11. That if Chalamidas does not elect to so acquire such property being sold or taken by Sierra within said thirty day period, at the expiration thereof the trustee shall deed such property to the purchaser or Sierra, as directed by Sierra, and upon notice Chalamidas shall vacate such real estate sold. That upon such sale all taxes and insurance shall be pro rated as customary in the state of New Mexico to the date of sale.

15. That Sierra may sell, cause to be sold or take for its own account the Western Skies Motor Hotel, adjacent property, and all supplies, goods, food, liquor and personal property utilized in the operation of said hotel, together with the liquor license pertaining thereto, at any time upon thirty days notice to Chalamidas by crediting the debt owed by Chalamidas in the amount of $4,000,000.00. That during the said thirty day notice period, Chalamidas may acquire said parcel being sold or taken by Sierra pursuant to the provisions of paragraph 11 or paragraph 13. That if Chalamidas does not elect to so acquire such property being sold or taken by Sierra within said thirty day period, at the expiration thereof the trustee shall deed the said motel hotel and adjacent property to the purchaser or Sierra, and Chalamidas shall transfer the liquor license, all as instructed by Sierra, and Chalamidas shall vacate the premises within fifteen days thereafter, or such longer period of time as designated by Sierra, leaving all supplies, goods, food, liquor and other motor hotel personal property as the property of the purchaser or Sierra, maintained at the usual and ordinary inventory levels. That the closing date of any

such sale shall be not sooner than fifteen days after the expiration of said thirty day notice period, with all taxes and insurance pro rated to the date of closing as customary in the state of New Mexico. That should Sierra sell or take said motel and related property as provided for in this paragraph, Sierra will, at the request of Chalamidas, at any time prior to said note becoming due and if the same is not delinquent, refinance the remaining real estate on at twenty (20) year self amortizing note, payable monthly and bearing interest at the rate of seven (7%) per cent per annum, containing the usual insurance, taxes, default and collection clauses.

16. That Chalamidas may, at their option, during 1974, prior to any notice of sale and if not in default in any provision hereof, cause the Western Skies Motor Hotel guest and/or public rooms to be refurnished as their obligation, but such refurnishing to be secured by the furnishings installed if not in an amount in excess of $200,000.00, payable within five years at a rate of interest not to exceed twelve (12%) per cent per annum simple interest. That all such refurnishing shall be in a tasteful manner, utilizing a good grade of hotel furnishings and installed by a knowledgeable and experienced hotel furnishing firm. That Chalamidas may affiliate the Western Skies Motor Hotel with a national hotel marketing organization or franchise company, such as Best Western Motels, Red Carpet Inns, Quality Courts, etc., in conjunction with refurnishing the same. That should Sierra sell or take title to said motor hotel, under any provisions hereabove, the debt for such furnishings shall be assumed by the new title holder as a part of any such transaction and the payment schedule performed thereby. That any affiliation agreement, however, must contain a cancellation clause, without penalty, at the election of the new owner or the franchise company in the event of the sale of said hotel. That in regard hereto, all present furniture, carpets, drapes, bedding and room decorations may be traded in to the hotel furnishing firm upon installation of new furnishings, provided the fair market value therefor is credited to the cost of the new furnishings. That in the event the present furnishings are not traded in, the same shall be sold at their fair market value and the proceeds therefrom directly expended on needed capital improvements to the motor hotel property, furnishings or equipment. That in further regard to this paragraph, Sierra shall be kept fully advised of all aspects hereof by Chalamidas, with counsel for Sierra furnished a copy of any proposed agreement pertaining hereto for review and the advice and consent of Sierra prior to execution thereof by Chalamidas.

17. That upon execution hereof and upon execution of the related warranty deeds and note, all prior contracts, agreements, notes, mortgages, deeds of trust and other instruments shall be deemed void and of no further force and effect, except all security agreements, financing statements and assignments of leases and licenses that provide Sierra with a first lien security in the furnishings, fixtures, equipment, work in process, inventory of merchandise and supplies, accounts receivable and all other personal property appurtenant to the Western Skies Motor Hotel shall remain valid and in full force and effect, constructively running from the trustee as assignee of Chalamidas in favor of Sierra. That all other real estate previously mortgaged to Sierra by Chalamidas, that has not been previously sold and conveyed to Sierra by Chalamidas or transferred to the trustee pursuant to this Agreement, is released to Chalamidas as their separate property.

18. That the life insurance policy on the life of Peter Chalamidas presently owned by Sierra shall remain the property of Sierra and shall remain in full force and effect, it being paid up through the second year. That upon the second anniversary thereof the same shall be kept in force by Chalamidas, on a monthly payment mode, for as long as the debt to Sierra by Chalamidas exceeds the face amount thereof. That the

proceeds of such policy shall be applied upon the insured event, if ever, to satisfy first all accrued interest, second the secured indebtedness pertaining to the real estate other than the Western Skies Motor Hotel, with said real estate to be conveyed thereafter by the trustee to Elizabeth Chalamidas if she be living or the estate of Peter Chalamidas if she be deceased, and the balance of the proceeds applied to reduce the principal owed by Chalamidas on the Western Skies Motor Hotel. That should the said motor hotel be sold by Chalamidas or Sierra, or transferred to Chalamidas or Sierra prior to the second anniversary, said policy shall be assigned to Chalamidas.

19. That Sierra shall have the right to inspect the books and records of Chalamidas or the Midas Corporation that pertain to the operation of said Western Skies Motor Hotel at all reasonable times, and that Chalamidas shall furnish to Sierra true operating statements of said hotel business upon request.

This Agreement is executed as of the date first written on January 17, 1974, at Albuquerque, New Mexico, and Twin Falls, Idaho, and shall be fully binding on and inure to the benefit of the heirs, administrators, executors, successors and assigns of the parties, provided Chalamidas may not assign his interest herein without Sierra's written consent and in the event of the bankruptcy of Chalamidas, voluntary or involuntary, the real estate and personal property assigned to the trustee shall be assigned to Sierra or its assigns by the trustee upon the instructions of Sierra in full satisfaction of the debt secured thereby.

(s) Elizabeth Chalamidas          (s) Peter Chalamidas
Elizabeth Chalamidas              Peter Chalamidas

SIERRA LIFE INSURANCE COMPANY

ATTEST:          by (s) Fred M. Frazier
                          President

(s) Robert R. Nunnelley
Assistant Secretary

This Agreement is accepted and ratified by the undersigned corporation as its interest may appear, and it agrees to be fully bound by the terms hereof.

Dated January 17, 1974.

MIDAS CORPORATION

by (s) Peter Chalamidas
          President

Western Skies Corporation hereby acknowledges receipt of a true copy of this Agreement and that it agrees to act as trustee as designated herein, and to faithfully discharge its duties and obligations and be fully bound by the terms hereof.

Dated January 17, 1974.

WESTERN SKIES CORPORATION

by (s) Fred M. Frazier
          President