**In re CONTINENTAL RESOURCES CORP., Debtor.**

**Bankruptcy No. BK–84–00061–B.**

United States Bankruptcy Court,
W.D. Oklahoma.

Oct. 26, 1984.

D. Kent Meyers and Ann L. Faford of Crowe & Dunlevy, Oklahoma City, Okl., William J. Reifman, James M. Lawniczak and Patricia R. McMillen of Mayer, Brown & Platt, Chicago, Ill., for Continental Illinois Nat. Bank and Trust Co. of Chicago.

W.J. Winterstein, Jr. and Stephen J. Moriarty of Edwards, Roberts & Winterstein,

Oklahoma City, Okl., for the Federal Deposit Ins. Corp.

## MEMORANDUM OPINION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

This matter is before the Court on an application for classification of claim. A hearing was held on August 16, 1984, with the parties submitting extensive briefs, both pre- and post-hearing. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157.[1] A discussion of the facts leading up to the application will put the matter in its proper posture.

Sometime in June of 1981, the debtor herein, Continental Resources Corp. (hereinafter "CRC") and the former Penn Square Bank, N.A. (hereinafter "PSB"), executed a certain secured revolving credit agreement whereby PSB committed to loan to CRC the sum of $20,000,000.00 on a revolving basis. Pursuant to this agreement, CRC executed a promissory note in the amount of $20,000,000.00, evidencing the loan under the revolving credit agreement. This note was subsequently renewed in June of 1982 in the amount of $19,000,000.00. As security for this promissory note, CRC granted to PSB a mortgage on all of CRC's oil and gas wells. These mortgages were filed as security agreements and financing statements with the court clerks of the respective counties in which the wells are located. Continental Illinois National Bank & Trust Company of Chicago (hereinafter "CINB") became a 95% participant in the June loan.

Sometime in December of 1981, CRC obtained an additional commitment to borrow from PSB in the amount of $10,000,000.00. Some $5,850,000.00 was actually funded. CNB is not a participant in this second loan.

On July 5, 1982, the Comptroller of the Currency of the United States declared PSB insolvent and appointed the Federal Deposit Insurance Corporation (hereinafter "FDIC") as receiver of PSB, pursuant to 12 U.S.C. §§ 191 and 1821(c), for the purpose of taking custody of and liquidating the insolvent bank's assets.

By the instanter application, the FDIC in its capacity as receiver of PSB seeks to have the Court determine that the loan of December, 1981 is secured by the June, 1981 oil and gas mortgages.

The issue, as framed by the FDIC, can be stated thusly: irrespective of whether the oil and gas mortgages are classified as either real, or as personal property, under Oklahoma real property law the omnibus provision in the respective mortgages is enforceable, and under Oklahoma's Uniform Commercial Code, the future advance clause contained in the promissory note is valid. The FDIC argues that as the documents are clear and unambiguous, any evidence of subjective intent in executing the documents in question is violative of the parol evidence rule.

The position of CINB in this is that as a matter of law, owing to the participation agreement sold to CINB by PSB, the FDIC, as receiver of PSB, has no debt that is secured by the mortgages, that the FDIC's only interest is as an agent and not as an economic investor; that PSB by way of the December note has diluted CINB's collateral and therefore there has occurred a breach of a contractual duty to deal in good faith owed to CINB. More importantly, CINB argues that as the December loan was not of the "same class" as the June loan and as it was not within the contemplation of either the borrower or the lender for the December loan to be secured by the oil and gas mortgages, the future advance clause contained in the respective mortgages is invalid.

■ Each of the mortgages in question provide the following so-called "omnibus" provision:

> core and related distinctions are now applicable. None of the parties have questioned that this matter is a core proceeding.

---

1. The Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, was enacted on July 10, 1984. Jurisdictional amendments went into effect immediately. Therefore, the

This mortgage is given to secure the following indebtedness ... [a]ll loans and advances which Mortgagee may hereafter make to Mortgagor, and all other and additional debts, obligations and liabilities of every kind and character of Mortgagor ... together with any and all renewals and extensions of such loans, advances, debts, obligations and liabilities, or any part thereof, and all interest, attorney's fees and other charges thereof, or incurred in connection therewith.

CINB has not taken issue with the FDIC's interpretation of the law with respect to mortgages re omnibus provisions and the Uniform Commercial Code re future advance clauses. It is clear that "[a] mortgage to secure future advances with terms extending the security to other obligations is recognized as valid in Oklahoma." *First National Bank in Dallas v. Rozelle*, 493 F.2d 1196, 1201 (10th Cir.1974) (citations omitted). *See also First Nat. Bank & Trust v. Security Nat. Bank*, 676 P.2d 837 (Okla.1984) (creditor may obligate the collateral to cover future advances or other value in the initial security agreement). The reason for the necessity of such language is apparent. With the advent of larger and more complex credit transactions, and greater sophistication among both borrowers and lending institutions, the documentation evidencing such transactions may be measured not in pages, but in pounds. The above-quoted language is not mere excess verbiage. Rather, it serves an important function. It would work an extreme impracticality to execute such documentation time and again as a result of further advances being extended from an identical lender. In the instant case, the quoted language appears clearly on the first page of each mortgage; it is not buried in fine print toward the latter portion of the document.

In the course of the hearing the FDIC introduced into evidence a copy of a promissory note (hereinafter the "FDIC note") signed by George N. Keeney, the corporate comptroller of CRC, and dated December 16, 1981. This note, in the face amount of $10,000,000.00, reflects that the purpose of the loan was for a "production revolver". The collateral was listed as "oil and gas mortgages". The maturity date was January 29, 1983. The FDIC argues that this note, coupled with the mortgages executed in June of 1981, clearly and unambiguously demonstrates an intent to bring the December, 1981 loan within the future advance clause of the executed mortgages.

To rebut this, CINB introduced into evidence an unexecuted copy of the December 16, 1981 note (hereinafter the "CINB note"). This note, also in the face amount of $10,000,000.00, reflects that the purpose of the loan was for a "lease acquisition line of credit". The collateral was listed as "negative pledge on leases acquired under the line". The maturity date was January 29, 1982. CINB also introduced into evidence a negative pledge agreement entered into between CRC and PSB whereby CRC, in consideration of a $10,000,000.00 loan, agreed not to transfer, sell or encumber the oil and gas properties which are the subject of the June mortgages, without the consent of PSB. CINB further introduced into evidence a commercial loan worksheet, prepared by PSB, regarding CRC and which reflected the identically stated collateral and purpose as the CINB note. As did a PSB internal memorandum on CRC, dated October 20, 1981, introduced into evidence at the hearing.

When questioned as to the discrepancy between the FDIC note and the CINB note, Mr. Keeney testified that the intent of both CRC and PSB was to enter into a transaction whereby a loan would be secured by a negative pledge, that the reason for his not signing the CINB note was owing to the short maturity date. His testimony was that he signed the FDIC note in blank with the understanding that all save the maturity date was to have been identical and was unaware of any alteration in collateral description.

Also called to testify on behalf of CINB was Russell Bainbridge. Mr. Bainbridge, formerly an employee of CINB was, at the time of the loan in question, the account

executive in charge of the CRC account at PSB. Mr. Bainbridge testified that he negotiated the December, 1981 loan on behalf of PSB and that it was the parties' intent that such loan was to be unsecured. He further testified that it was he who prepared the October 20, 1981 memorandum. This memorandum is a report to the loan committee at PSB which detailed the terms and conditions of the December loan. The report is "noted" by way of Mr. Bainbridge's signature. There is also a signature line for Mr. Bill G. Patterson, senior executive vice president, to signify approval, which remained unsigned. We point this out without commenting on its significance or lack thereof. However, the commercial loan worksheet does reflect approval by way of the initials "RBB" and "BGP", ostensibly the initials of Messrs. Bainbridge and Patterson. Mr. Bainbridge further testified that his initials appear on the CINB note, that a bank officer initials a note when it is to be "booked", the initialling being a form of approval. Mr. Bainbridge testified that the initials "RBB" on the FDIC note were not his initials and that he had no recollection of initialling such a note.

Finally, Mr. Richard Lucas, who at the time of the loans in question was the banking officer at CINB involved with the CRC account, testified that Mr. Bainbridge had conveyed to him that the December, 1981 loan was to be secured by the negative pledge agreement.

The seminal case in this matter is *First National Bank in Dallas v. Rozelle, supra. Rozelle* involved the interpretation of a mortgage containing a future advance clause. In *Rozelle* the bank (the mortgagee) argued that the mortgage at issue was unambiguous and must be construed without resort to parol evidence. Rozelle (the mortgagor) argued that all the proof of the surrounding circumstances and intent should be considered. The Tenth Circuit agreed that the surrounding circumstances and the relationship of the parties should be taken into consideration; that construing the contract in the light of the surrounding circumstances known to the par-

ties at the time of execution does not violate the parol evidence rule. And this is true even if the writing would be deemed unambiguous. *Id.* at 1200. *See Chalamidas v. Sierra Life Ins. Co.,* 632 F.2d 1381 (10th Cir.1980) (trial court properly considered the general surrounding circumstances in interpreting a contract). Nevertheless, "[c]onsideration may not be given to the statements of either party as to their subjective intent in making the written contract." *First National Bank in Dallas v. Rozelle, supra,* at 1201. "The language of [a] contract, unless ambiguous, represents the intention of the parties. The intent deduced from this objective matter, not the parties' subjective understandings, is controlling." *Kimbell Foods, Inc. v. Republic Nat. Bank,* 557 F.2d 491, 496 (5th Cir.1977) (citing *First National Bank v. Rozelle, supra*). "Testimony as to . . . subjective intent in receiving the future advance clause [is] a classic violation of the parol evidence rule and clearly inadmissible." 557 F.2d at 496. In Oklahoma, the law governing contract interpretation places primary significance on the intent of the parties at the time of contracting. *Amoco Production Co. v. Lindley,* 609 P.2d 733 (Okla.1980).

Relying on the rule of *Security Nat. Bank v. Dentsply Professional,* 617 P.2d 1340 (Okla.1980), CINB has attempted to distinguish the holding in *Rozelle. Dentsply* articulated the test that whether future liabilities fall within the ambit of a future advance clause is to be determined by whether the debts are of the "same class as the primary obligation" and "in contemplation of the parties at the time the agreement was executed." 617 P.2d at 1346 (citations omitted). Much of the testimony at the hearing revolved around the parties' intent, with CINB attempting to demonstrate that both parties intended that the December, 1981 note was to be secured by the negative pledge.

Assuming, *arguendo,* that we are justified in examining the parties' intent, we note that the parties' intent was not totally in accord. Mr. Keeney testified that the

reason he did not sign the CINB note was owing to its short maturity date. Yet, both the commercial loan worksheet and the October 20, 1981 memorandum reflect a maturity date of January 29, 1982, which echoes the maturity date on the CINB note. These were documents prepared under the direction of Mr. Bainbridge. The point, albeit minor, merits comment.

Isolating solely on the December note, Mr. Bainbridge testified that the initials on the FDIC note were not his and that he had no recollection of initialling such a note. We have examined the four documents entered into evidence at the hearing purportedly bearing Mr. Bainbridge's initials: the FDIC note, the CINB note, the June, 1982 renewal note, and the commercial loan worksheet. Quite naturally, none of the initials are exactly alike. Apart from Mr. Bainbridge's failure to recollect the initialling, there was no evidence introduced which would tend to show that the initials on the FDIC note were not of his making. Mr. Bainbridge's recollection aside, we cannot say that he did not initial the FDIC note.

▮▮▮▮ With these prefatory comments in mind, we do not believe we can consider testimony regarding the parties' intent surrounding the December, 1981 loan. *Rozelle* stated that statements of *either* party as to subjective intent may not be given consideration. Rather we are told that we are to look at the "surrounding circumstances" and "relationship of the parties". We cannot then, look at the December, 1981 loan as though it were in a vacuum. The circumstances, *in toto*, must be examined. The issue is not whether the parties intended for the December, 1981 loan to be "secured" by a negative pledge, but rather

whether the future advance clause contained in the oil and gas mortgages is to be enforced. As *Rozelle* clearly states, such a mortgage extends the security to other obligations. To consider the subjective intent of the parties regarding the December, 1981 loan would be to totally abrogate the validity and significance of the future advance clause. This we cannot do.[2] Accordingly, we will not take into consideration the subjective intent of the parties regarding the December loan.

▮▮▮▮ We are further compelled to reach this decision from a practical standpoint. Throughout the course of the hearing the December loan was classified as "secured" by a negative pledge agreement, that said agreement was the "collateral" for the December loan. While these characterizations may be employed for purposes of convenience in the context of banking transactions, they are totally inaccurate in a legal sense.[3] A negative pledge is merely an agreement to forbear from taking some manner of action. CINB in its brief admits that a negative pledge cannot be a security interest. So in June of 1981, PSB makes a loan of $20,000,000.00, secured by oil and gas mortgages. Six months later, we are to believe that PSB was willing to loan an additional $10,000,000.00 without taking any security. What had so drastically altered the financial status of CRC to merit such treatment? It would appear to be more plausible to infer that PSB was willing to make such additional loan cognizant of the fact that such a loan would be secured pursuant to the future advance clause contained in the June mortgages. During cross-examination Mr. Bainbridge testified that in December of 1981 he was aware PSB held the oil and

---

**2.** Much of the testimony at the hearing necessarily revolved around the CINB note and the FDIC note. The execution of the FDIC note vis-a-vis the CINB note was not an "alteration" in the classic sense of the term. Rather it was the filling in of blanks on a signed document. This is an issue which we have addressed previously. *See In re Schick Oil & Gas, Inc.,* 35 B.R. 282 (Bankr.W.D.Okla.1983). Such a practice is valid as long as certain bounds of authority are not breached. In light of our finding that we must

look at the surrounding circumstances, viz: the loans of June *and* December and the relationship of the parties, we cannot say that PSB breached its authority by filling in the executed December note.

**3.** Indeed, the characterization of the December loan in these terms does not, we believe, vitiate the validity of the future advance clause contained in the June mortgages.

gas mortgages in question, and when asked if that knowledge entered into his decision in making the December loan stated that the bank considered CRC to possess a good credit rating. Indeed, at the time, and in light of the mortgages containing a future advance clause, PSB would be completely justified in such an assumption.

CINB has also posited that the December, 1981 loan cannot be secured by the future advance clause since the December loan was not of the "same class" as the primary (the June, 1981) obligation, this being the second requirement of *Dentsply*.

At the hearing Mr. Keeney testified that CRC was an oil and gas operation and development company; that the proceeds of the June, 1981 loan were utilized for oil well completion costs and ordinary working capital expenditures. He testified that the purpose of the December, 1981 loan was to obtain funds for acreage acquisition. CINB argues that as the proceeds of the December loan were utilized for expenditures different from those of the June loan, the loans were not of the "same class" and therefore fail the *Dentsply* mandate. In *Dentsply*, the Oklahoma Supreme Court affirmed a state court ruling that an overdraft on a debtor's business bank account was secured by the future advance clause of a security agreement covering business equipment, but that the future advance clause did not secure overdrafts on the debtor's personal bank account. *But see Thorp Sales Corp. v. Dolese Bros. Co.*, 453 F.Supp. 196 (W.D.Okla.1978). "The Court is convinced ... that it is no longer necessary, as between the original lender and the original debtor, for future advances to be of the same class as the primary obligation." *Id.* at 200. Without discussing the issue, the Tenth Circuit in *First National Bank in Dallas v. Rozelle, supra*, held that loans advanced for ranching operations were secured by a prior oil and gas mortgage which contained a future advance clause. As one court noted, "[t]he application of the 'same class' test ... has been criticized and explicitly or implicitly has been rejected by some courts." *In re Johnson*, 9 B.R. 713, 715 (Bankr.M.D.Tenn.

1981) (citing *First National Bank in Dallas v. Rozelle, supra* and *Thorp Sales Corp. v. Dolese Bros. Co., supra*).

■ Whether the "same class" doctrine is alive and prospering in Oklahoma we need not decide for, having examined the nature of the June and December loans, we cannot say that they are so wholly unrelated so as to be considered not of the "same class". The testimony was that CRC was an oil and gas exploration company. In that regard, to say that a loan whose proceeds are for lease acreage acquisition is sufficiently dissimilar from loan proceeds for oil well completion is to draw too fine a line. "Different loans intended to provide a debtor with 'working capital' [are] all of the same class within the meaning of [the same class] test." *Security Nat. Bank v. Dentsply Professional, supra,* at 1346. Clearly, the purpose of both the loans at issue was to fund the business operations of CRC; the loans shared a common purpose. To find otherwise would be to elevate form over substance.

As a final argument, CINB has raised the issue of PSB's duty to deal fairly with CINB. This obligation, argues CINB, derives from the duty to deal fairly and in good faith, implied in the parties' contractual relationship. CINB posits that permitting the oil and gas mortgages to act as security for the December loan would be to dilute CINB's collateral, which, *a fortiori*, was a breach of PSB's duty, and that the FDIC may not rely on such breach to the detriment of CINB.

The contractual relationship between CINB and PSB arose when CINB became a participant in the June, 1981 loan; the participation agreement governs the participation relationship. *Hibernia Nat. Bank v. Federal Deposit Ins. Corp.*, 733 F.2d 1403 (10th Cir.1984). It is therefore proper for the Court to review the documents which implemented the relationship. The participation agreement contains the following language:

> We [PSB] make no representation or warranty, and assume no responsibility

with respect to, the execution, validity, accuracy, sufficiency or enforceability of the Agreement, the Note, or any other document delivered under or pursuant to the Agreement or of any collateral for the Loans, the collectibility of the Note or the descriptions of or titles to the property constituting collateral. We assume no responsibility for the financial condition of the Borrower, [or] for the security value of any collateral . . . .

. . . .

[W]e will not without your prior written consent exercise any such rights which would . . . release any collateral for the Loans . . . .

The certificate of participation, executed simultaneously with the participation agreement, states: "It is expressly understood that we [PSB] do not make any representations or assume any responsibility with respect to the validity, genuineness or collectibility of said note, or the collateral securing the same . . . . We reserve the right to release collateral and to permit substitutions of new collateral." [4]

Participation agreements were recently at issue in Oklahoma in the case of *Chase Manhattan Bank, N.A. v. F.D.I.C.*, 554 F.Supp. 251 (W.D.Okla.1983). Chase Manhattan Bank had been a participant in loans generated by, once again, PSB. The certificate of participation provided that

[t]he participant [Chase] shall have no interest in any property taken as security for any other loan or loans made to the borrower by the Bank [PSB], or in any property now or hereafter in the possession or control of the Bank which may be or become security for the loan by reason of the general description contained in any general loan and collateral agreements . . . .

Finding that PSB did not assign to Chase the participated loans or the collateral securing such loans, the Court stated that "[t]he participating bank which is not an assignee has merely contractual rights and no property rights in the participated loans or the collateral securing them." 554 F.Supp. at 256.

While the certificate of participation before us does not contain the language of the certificate of participation before the Court in *Chase Manhattan Bank, N.A. v. F.D.I.C., supra,* a certificate of participation identical to that before us was recently before the Tenth Circuit in *Hibernia Nat. Bank v. Federal Deposit Ins. Corp., supra.* The participating bank in *Hibernia* had attempted to argue that the participation in certain loans transferred "ownership" to the participant. Disagreeing, the Tenth Circuit noted: "The lead [PSB] is the only secured party. The 'participants' can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers." 733 F.2d at 1407.

■ In view of these decisions, mindful of the principle that the participation agreements govern the participation relationship, we cannot agree with CINB that PSB's treatment of the collateral of the June, 1981 loan did violence to the participation agreements. Should CINB feel that some manner of contractual duty owed it has been breached, it is certainly free to pursue such claim in the proper forum. We merely hold that the treatment of the collateral pursuant to the participation agreement and certificate of participation does not alter the nature of FDIC's secured status under the December loan.

In conclusion we reiterate an oft-utilized maxim. Although strict adherence to legal precepts may at times lead to harsh results, efforts by courts to fashion equitable solutions for mitigation of hardships experienced by creditors in the literal application of such precepts may produce the deleterious effect of reducing the degree of

---

**4.** Query whether "we will not . . . exercise such rights which would . . . release any collateral for the loans" and "we reserve the right to release collateral and to permit substitutions of new collateral" create an ambiguity.

reliance the debtor-creditor arena should be, and must be, entitled to expect.

Accordingly, for all the hereinabove mentioned reasons, the application of the FDIC for classification of claim as secured shall be and hereby is, granted. Pursuant to Bankr.R. 7052 this memorandum constitutes our findings of fact and conclusions of law.

Judgment will be entered separately.