799 F.2d 622
 2 UCC Rep.Serv.2d 695
 In re CONTINENTAL RESOURCES CORPORATION, Debtor.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF
CHICAGO, Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Appellee.
 No. 85-1815.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 22, 1986.
 
 William J. Reifman, of Mayer, Brown & Platt, Chicago, Ill. (James M. Lawniczak, D. Kent Meyers and Ann L. Faford, of Crowe & Dunlevy, Oklahoma City, Okl., with him on the briefs), for appellant.
 Stephen J. Moriarty (John P. Roberts with him on the brief), of Edwards, Roberts & Propester, Oklahoma City, Okl., for appellee.
 Before LOGAN and BALDOCK, Circuit Judges, and SAFFELS, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 This is an appeal from the district court's order affirming an order by the bankruptcy court in the bankruptcy proceedings of Continental Resources Corporation (Continental Resources). For the reasons set forth below, we affirm.
 
 I.
 
 2
 Continental Resources was an oil and gas exploration and development company. It entered into an agreement with Penn Square Bank (Penn Square) in June, 1981, to establish a $20 million revolving loan (June loan). Continental Resources executed a promissory note payable to Penn Square for $20 million and granted mortgages on certain oil and gas properties located in Oklahoma. Continental Resources borrowed less than $14 million in 1981 on this note.
 
 
 3
 Following execution of the note and mortgages in June, 1981, Continental Illinois National Bank (Continental Bank) purchased a "participation" from Penn Square in the loan to Continental Resources. The result of the participation was that Continental Bank funded the major portion of the loan to Continental Resources.
 
 
 4
 In December, 1981, Penn Square agreed to the creation of a second loan with Continental Resources (December loan). Continental Resources executed a second promissory note dated December 16, 1981, payable to Penn Square for $10 million. The note lists "oil and gas mortgages" as collateral. Continental Resources and Penn Square also entered into a "negative pledge agreement" dated January 11, 1982, whereby Continental Resources agreed not to encumber certain oil and gas properties in consideration for the $10 million in credit. Continental Resources borrowed $5.85 million on the December note. Continental Bank did not participate in this second loan.
 
 
 5
 In July, 1982, the Comptroller of Currency declared Penn Square insolvent and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. In January, 1984, a petition for bankruptcy was filed against Continental Resources. In July, 1984, the FDIC, as receiver of Penn Square, filed an application for classification of claims asserting that its claim under the second note is secured by the June, 1981, oil and gas mortgages. Continental Bank opposed the classification. The bankruptcy court conducted a hearing on August 16, 1984, and rendered its decision on October 26, 1984, finding the FDIC's claim under the second note secured by the June, 1981, oil and gas mortgages. In re Continental Resources Corp., 43 B.R. 658 (Bankr. W.D.Okla.1984). The district court affirmed, without opinion, on April 26, 1985.
 
 II.
 
 6
 The issues asserted by Continental Bank on appeal may be summarized as follows:
 
 
 7
 (A) Whether Penn Square Bank breached its duty of good faith.
 
 
 8
 (B) Whether the bankruptcy court erred in refusing to consider testimony regarding the intent of the parties in executing the December, 1981, loan; and
 
 
 9
 (C) Whether the December, 1981, loan is of the same "class" as the June, 1981, loan.
 
 A. Good Faith
 
 10
 Continental Bank argues that the bankruptcy court refused to consider whether Penn Square Bank breached its implied duty of good faith and that such breach bars the FDIC's judgment. Continental Bank observes that there was an implied duty of good faith and fair dealing between the parties arising from the participation agreement. It also asserts that Penn Square Bank's use of the oil and gas mortgages to secure the December loan diluted Continental Bank's collateral in the June loan. Continental Bank then argues that Penn Square Bank's action diluted Continental Bank's collateral in the June loan, breaching its duty of good faith, and that the FDIC, as Penn Square Bank's successor, is barred from relying on the breach to Continental Bank's detriment.
 
 
 11
 The bankruptcy court carefully considered Continental Bank's arguments and concluded that "we cannot agree with CINB [Continental Bank] that PSB's [Penn Square Bank] treatment of the collateral of the June, 1981 loan did violence to the participation agreements." It reviewed the participation agreement and the certificate of participation, noted language in these documents concerning Penn Square Bank's relationship to the collateral and observed that Penn Square Bank, as lead bank, is the only secured party. We agree with the bankruptcy court's conclusions.
 
 
 12
 The contractual relationship between Continental Bank and Penn Square arises from the participation agreement. As the bankruptcy court recognized, the participation agreement governs the participation relationship. Hibernia Nat. Bank v. Federal Deposit Ins. Corp., 733 F.2d 1403, 1408 (10th Cir.1984). Paragraph 3 of the agreement contains the following sentences: "We make no representation or warranty, and assume no responsibility with respect to, the execution, validity, accuracy, sufficiency or enforceability ... of any collateral for the loans.... We assume no responsibility ... for the security value of any collateral...." In paragraph 4, Penn Square Bank reserved "the right, in our sole and absolute discretion in each instance, without prior notice to you ... to exercise or refrain from exercising any rights, powers or remedies which we may have under ... the note ... except that we will not without your prior written consent exercise any such rights which would ... release any collateral for the Loans...." Article I, section 1.1(a) of the June, 1981, oil and gas mortgage contained a future advance clause with the following language:
 
 
 13
 This mortgage is given to secure the following indebtedness, to-wit: A note dated June 19, 1981, in the amount of Twenty Million Dollars ... [and] all loans and advances which Mortgagee may hereafter make to Mortgagor, and all other and additional debts, obligations and liabilities of every kind and character of Mortgagor now or hereafter existing in favor of Mortgagee, regardless of whether such debts, obligations or liabilities be direct or indirect, primary or secondary, joint, several, fixed or contingent, and irrespective of the manner in which some may be incurred....
 
 
 14
 Section 1.1(c) provides more specifically that:
 
 
 15
 All indebtedness, other than that mentioned above, which at any time prior to the final release thereof may become owing to Mortgagee by Mortgagor, whether direct or indirect, primary or secondary, fixed on contingent, and irrespective of the manner in which same may be incurred, it being contemplated by Mortgagor and Mortgagee that Mortgagee may from time to time make additional loans and future advances hereunder, the total of such additional loans and future advances not to exceed the sum of $20,000,000.00. Any additional loan or advance made hereunder may be made without notice to or the consent of anyone bound by this mortgage, other than the person or party to whom the advance or loan is made; but nothing contained herein shall impose upon the Mortgagee the duty or obligation to make any additional loan or advance.
 
 
 16
 The parties do not dispute that Oklahoma law is applicable to the note and mortgage and that the future advances clauses, with terms extending the security to other obligations, is valid and enforceable. First Nat. Bank & Trust v. Security Nat. Bank, 676 P.2d 837 (Okla.1984); Gilpatrick v. Hatter, 258 P.2d 1200 (Okla. 1953); Johnston v. American Finance Corp., 182 Okl. 567, 79 P.2d 242 (1938). In light of the provisions contained in the note, mortgage and participation agreement, we cannot conclude that Penn Square violated any duty of good faith. Continental Bank purchased its participation in the June loan with the knowledge of the future advance provisions. Thus, it participated in the loan subject to the loan's conditions. It maintains, however, that the provision in the participation agreement requiring prior notice of any release of collateral was violated. We cannot accept Continental Bank's assertion that the use of the collateral to secure the December loan constitutes a release of collateral, especially in light of the specific future advance clauses contained in the June loan. Because the participation agreement and the June loan granted Penn Square the right to use the oil and gas mortgages to secure future debts, there can be no breach of an implied duty of good faith and fair dealing.
 
 
 17
 Continental Bank also asserts that Penn Square breached a fiduciary duty when it used the collateral from the June loan to secure the December loan. To support its argument concerning the creation of a fiduciary relationship, it notes language in the participation agreement that indicates that Penn Square holds the oil and gas mortgages for Continental Bank's pro rata benefit. Whether a fiduciary relationship exists is to be determined by the specific facts of a case. Lewis v. Schafer, 163 Okl. 94, 20 P.2d 1048, 1050 (1933). Although courts generally have refrained from defining the particular instances of fiduciary relationship, Sellers v. Sellers, 428 P.2d 230, 236 (Okla.1967), the general definition of "fiduciary" contained in Black's Law Dictionary, 5th Edition, at 563 has been used:
 
 
 18
 A person or institution who manages money or property for another and who must exercise a standard of care in such management activity imposed by law or contract....
 
 
 19
 Quoted in Lindsay v. Gibson, 635 P.2d 331, 332 n. 1 (Okla.1981). Whatever fiduciary relationship may have been created by the participation agreement, if any, it was certainly qualified by the agreement's specific terms as previously discussed. Additionally, because Continental Bank participated in the loan with the knowledge or notice that the collateral could be used for future loans, Penn Square was not under a duty to refrain from using the collateral for a second loan. Thus, we cannot conclude that there was a breach of fiduciary duty.
 
 B. Intent of the Parties
 
 20
 Continental Bank argues that the bankruptcy court erred by not considering testimony regarding the intent of the parties in executing the December loan. It maintains that the parties did not intend the December loan to be secured by the June, 1981, mortgages, but that they had agreed to an unsecured, negative pledge arrangement. The bankruptcy court ruled that because the language relating to collateral was clear and unambiguous, resort to parol evidence was unnecessarqy and inappropriate.
 
 
 21
 We begin by observing that the parol evidence rule is a rule of substantive law. Baum v. Great Western Cities, Inc., of New Mexico, 703 F.2d 1197, 1205 (10th Cir.1983); Fulton v. L & N Consultants, Inc., 715 F.2d 1413, 1418 n. 3 (10th Cir.1982); Investors Royalty Co. v. Lewis, 185 Okl. 302, 91 P.2d 764, 766 (1939). Because the December note provides that it is to be "construed according to the laws of the State of Oklahoma," we will look to Oklahoma parol evidence law to determine whether it is appropriate to consider testimony of the parties' intent under the circumstances of this case.
 
 
 22
 In Oklahoma, the parol evidence rule has been codified in Okla.Stat.Ann. tit. 15, Sec. 137 (1983), which provides as follows:
 
 
 23
 The execution of a contract in writing, whether the law requires it to be written or not, supercedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument.
 
 
 24
 It is well established in Oklahoma that the execution of a written contract supercedes all oral negotiations or stipulations concerning its terms and subject matter in the absence of accident, fraud or mistake of fact in its procurement, and any representations made are inadmissible to contradict, change or add to the terms of the written contract. Mercury Inv. Co. v. F.W. Woolworth Co., 706 P.2d 523, 529 (Okla.1985); Lively v. Davis, 410 P.2d 851, 856 (Okla.1966); Wichita Floor Mills Co. v. Guymon Equity Exchange, 150 Okl. 245, 1 P.2d 657, 659 (1931). Although this rule clearly applies to parties to the agreement and their privies, In re Assessment of Alleged Omitted Property, 177 Okl. 74, 58 P.2d 134, 137 (1936), it has been relaxed where a stranger to the writing is involved. 4 S. Williston, A Treatise on the Law of Contracts Sec. 647 at 1161-67 (3rd ed. 1961); 3 A. Corbin, Corbin on Contracts Sec. 596 (1960); 30 Am.Jur.2d Sec. 1029-31 (1967); Fulton v. L & N Consultants, Inc., 715 F.2d at 1418. Continental Bank, however, is so closely affiliated with Penn Square Bank in the transaction that the former cannot be deemed a stranger to the contract for purposes of the application of the parol evidence rule. It is clearly a beneficiary of the note and its predecessor in interest was a party to the contract. "There is no doubt that if a third person claims in the right of a party to a written contract, he is subject to the parol evidence rule." 4 S. Williston, A Treatise on the Law of Contracts Sec. 647 at 1165. Thus, Continental Bank may not avail itself of this exception.
 
 
 25
 Another exception to the parol evidence rule is when there has been a subsequent alteration or modification of the terms of a contract. See generally 30 Am.Jur.2d Sec. 1063. Parol evidence of the modification or alteration, therefore, is admissible. In this case, testimony indicates that the December note was blank when signed by Continental Resources' chief financial officer, George Keeney. The terms of the note, including the collateral section, were filled in thereafter by Penn Square Bank personnel. We agree with the bankruptcy court that filling in the blanks of the note is not, strictly speaking, an alteration of the instrument. In such cases, the issue is whether there was authority to fill them in. In re Schick Oil & Gas, Inc., 35 B.R. 282, 286 (Bankr.W.D.Okla.1983); First National Bank of McCook v. Hull, 189 Neb. 581, 204 N.W.2d 90, 94 (1973); Clark v. Dedina, 658 S.W.2d 293, 297 (Tex.App.1983); Roberts v. Southern Wood Piedmont Co., 571 F.2d 276, 279 (5th Cir.1978). Continental Bank does not refer to any Oklahoma law, and we have found none, that would permit parol evidence to show the intent of the parties under these circumstances. The bankruptcy court, therefore, did not err in refusing to consider parol evidence of intent when the language of the note is clear and unequivocal.
 
 C. Same Class
 
 26
 Continental Bank's final argument is that Oklahoma law requires that loans made pursuant to a future advance clause must be of the same "class" if secured by the same collateral. It insists that the December debt is not of the same class as the June loan and, therefore, is not secured by the oil and gas mortgages. In Security Nat. Bank v. Dentsply Professional, 617 P.2d 1340, 1345 (Okla.1980), the Oklahoma court recognized the rule that "whether future liabilities fall within a security agreement's future-advances clause is whether the debts are 'of the same class as the primary obligation'...." Continental Bank contends that the June loan and the December loan are not of the same class because the June loan was used for completion costs and working capital and the December loan was for acreage acquisition. The bankruptcy court found that Continental Resources was an oil and gas exploration company, that the loans were made to fund the company's business operations, that they shared a common purpose, and concluded that "they are not so wholly unrelated so as to be considered not of the 'same class.' " 43 Bankr. at 663. We find no error with these findings and conclusion.
 
 
 27
 Different loans intended to provide a debtor with working capital are of the same class. Dentsply, 617 P.2d at 1346. "Working capital" is a general term which refers to funds used to meet current obligations as they arise to carry on the purposes of the business. We agree with the bankruptcy court that the June loan may be classified generally as working capital. The December loan also may be categorized as working capital because of the nature of Continental Resources' business, i.e., oil and gas exploration and development. Record vol. I at 37. In the context of this case, funds used for maintaining an acreage inventory are as much working capital as funds used for completion activities. The bankruptcy court, therefore, did not err in its holding on this issue.
 
 
 28
 Accordingly, the district court's order affirming the bankruptcy court's decision is AFFIRMED.
 
 
 
 *
 The Honorable Dale E. Saffels, United States District Judge, District of Kansas, is sitting by designation