In re McLEAN INDUSTRIES, INC., et al., Debtor.

UNITED STATES LINES (S.A.), INC., Plaintiff,

v.

The UNITED STATES of America and Chemical Bank, in its capacity as depository, Defendants.

Bankruptcy Nos. 86–B–12238 (CB) to 86–B–12241 (CB).

Adv. No. 89–6125A.

United States Bankruptcy Court, S.D. New York.

Sept. 11, 1991.

As Corrected Sept. 17, 1991.

Milbank, Tweed, Hadley & McCloy by Robert Drain, New York City, for debtor.

Civ. Div., Dept. of Justice, Washington, D.C. by John T. Stemplewicz.

## DECISION ON MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT PERTAINING TO AN ALLEGED PREFERENTIAL TRANSFER

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

The plaintiff, United States Lines (S.A.), Inc. (the "Debtor" or "SA"), one of the debtors and debtors in possession, filed a motion for summary judgment and one of the defendants, the United States of America, on behalf of the Maritime Administration ("MARAD"), has cross-moved for summary judgment. The basis of this adversary is an alleged preferential transfer made by SA to MARAD.

The following are the uncontroverted facts:

The vessels, S.S. AMERICAN ARGO ("ARGO"), S.S. AMERICAN RIGEL ("RIGEL"), and S.S. AMERICAN VEGA ("VEGA"), (the "Vessel" or "Vessels"), were built in 1964 and 1965 for Moore–McCormack Liners, Inc. ("Moore–McCormack") and were then known as S.S. MORMACARGO, S.S. MORMACRIGEL and S.S. MORMACVEGA. Construction was financed in large part by United States government programs administered by MARAD. MARAD paid $15 million in construction-differential subsidy ("CDS") pursuant to a contract with Moore–McCormack, dated June 29, 1962, (the "1962 CDS Contract"). Additionally, Moore–McCormack issued bonds totaling $11,526,000 due April 1, 1987, secured by a first preferred ship mortgage on each Vessel, dated June 7, 1967 (the "1967 Ship Mortgage"), insured by MARAD under title XI of the Merchant Marine Act, 1936, as amended, 46 U.S.C. app. §§ 1271 *et seq.* ("Title XI").

Moore–McCormack operated the Vessels between ports along the Atlantic coast of

the United States and South Africa and the east coast of South America. The Vessels qualified for and received operating-differential subsidy ("ODS") from MARAD under contracts covering the above trade routes and authorized by Title VI of the Merchant Marine Act, 1936, as amended, 46 U.S.C. app. §§ 1171 *et seq.*

Beginning in 1981, the Vessels underwent extensive modifications, converting them from cargo to cargo/container ships by, among other things, adding a 115–foot midbody section to each Vessel. Reconstruction of the ARGO, RIGEL and VEGA cost approximately $54 million (not including the cost of a fourth vessel, the AMERICAN RESERVIST ("RESERVIST")), of which approximately $22.6 million came from another CDS contract (the "1981 CDS Contract"). Moore–McCormack also borrowed $34,300,000 (of which, approximately $25.7 million was allocated to the ARGO, RIGEL and RESERVIST) through Title XI bonds guaranteed by MARAD. The new Title XI bonds were secured by a second preferred fleet mortgage dated January 27, 1983 (the "1983 Fleet Mortgage").

Moore–McCormack also entered into certain tax benefit transactions (the "TBT Leases") to sell the tax benefits associated with reconstruction of ARGO and VEGA. The tax benefits relating to the TBT Leases, which Moore–McCormack sold for $6,210,000, decline over time through 1994. The TBT Leases were backed by letters of credit providing full indemnification should any of the tax benefits be terminated by mortgage foreclosure.

In early 1983, Moore–McCormack was acquired by McLean Securities, Inc., the parent of United States Lines, Inc. ("USL") and was renamed United States Lines (S.A.), Inc. In connection with the purchase, Chemical Bank ("Chemical") loaned SA $50 million secured partially by a preferred fleet mortgage on the vessels that SA acquired. Chemical's fleet mortgage was subordinate to the 1967 Ship Mortgage and the 1983 Fleet Mortgage.

In 1986, as part of a widely publicized debt restructuring plan necessitated by huge operating losses, SA asked MARAD and the Title XI bondholders to defer the $2,450,000 principal payment due June 30, 1986, on the 1983 Fleet Mortgage. MARAD and the bondholders agreed to defer the June 30, 1986 payment to June 30, 1988. In return, SA agreed to amend the security agreement under the 1983 Fleet Mortgage to include certain additional security defaults (the "Amended Security Agreement"). This was accomplished on July 31, 1986.

The Amended Security Agreement contained a covenant against bareboat chartering the Vessels without MARAD's consent. The same restrictive covenant was contained in the 1967 Ship Mortgage, the 1981 CDS Contract, SA's ODS contract, and the Title XI Reserve Fund and Financial Agreement entered into concurrently with the 1983 Fleet Mortgage. None of these agreements in any way restrict MARAD's power to consent to any bareboat charter of the Vessels.

On August 15, 1986, SA applied for MARAD's consent to proposed bareboat charters of the ARGO, RIGEL and VEGA to Lykes Bros. Steamship Company ("Lykes"). SA had not employed any of the Vessels in its own operations since December 1985. Lykes had agreed in principle to charter the Vessels, subject to MARAD's consent, for use on certain trade routes to be designated by Lykes in its own application.

On September 24, 1986, SA and Lykes signed a formal agreement ("Agreement to Charter") providing for a three-year bareboat charter of the Vessels and granting Lykes an option to purchase. The Agreement to Charter was conditioned expressly upon MARAD's consent to SA chartering the Vessels to Lykes as required by SA's ODS contract, the 1967 Ship Mortgage and the 1983 Fleet Mortgage and MARAD's consent to Lykes chartering the Vessels from SA as required by Lykes' ODS contract. The Agreement to Charter also was conditioned expressly upon MARAD agreeing to amend Lykes' ODS contract so that Lykes could operate the Vessels on a subsidized basis between ports along the Atlan-

tic coast of the United States and the west coast of South America.

On October 16, 1986, MARAD agreed to consent to the charters and to amend Lykes' ODS contract subject to certain conditions. Among other things, MARAD required an assignment of the charters as additional security for its mortgages on the Vessels.

Neither SA nor Lykes objected to MARAD's conditions, but, if the conditions had not been met, MARAD would not have consented to the charters or agreed to amend Lykes' ODS contract.

On November 4, 1986, the parties entered into a series of agreements: (1) three bareboat charter parties (the "Charters") between SA and Lykes; (2) a Charter Assignment and Agreement among SA, Lykes and MARAD (the "Assignment"); (3) a Depository Agreement between MARAD and Chemical (the "Depository Agreement"); and (4) an Agreement between MARAD and Lykes ("MARAD/Lykes Agreement") acknowledging MARAD's mortgages and its interest in the Charters and including covenants of quiet enjoyment.

The Charters were for three-year periods; however, they could be terminated at the end of the first year at Lykes' option.

The Charters made the following provision for payment of charter hire:

> Charter hire ... shall be paid ... to Chemical Bank or such other U.S. financial institution as shall from time to time be designated in writing by the United States of America represented by the Secretary of Transportation acting by and through the Maritime Administration (hereinafter the "Secretary"), for credit to the account of the Secretary pursuant to an assignment of this Charter and Charter Hire hereunder to the Secretary from Owner dated the date hereof.

The Assignment provided in relevant part, as follows:

> 1.1 The Shipowner hereby assigns transfers and sets over, and does hereby assign, transfer and set over unto Marad, its successors and assigns, all the right, title and interest of the Shipowner

in and to those each of the Charters ("Marad's Security Interest") as security for the Shipowner's performance of its obligations under the Mortgages and in consideration of Marad's consent to the Charters.

> 1.2 It is expressly agreed that anything herein contained to the contrary notwithstanding: (i) the Shipowner hereby irrevocably instructs the Charterer, pursuant to the terms of the Charters and for the account of Marad, to make all payments of Charter Hire and other amounts payable under or pursuant to the Charters directly to the Depository Account (as defined in the Depository Agreement, which is itself defined hereinafter), or such other account as Marad may notify the Charterer and the Shipowner of in writing, until the Charterer receives a written notice from Marad that all Title XI obligations under the Mortgages have been paid in full or otherwise released; (ii) the Shipowner shall remain liable under the Charters to perform all the obligations assumed by it thereunder; and (iii) Marad shall have no obligation or liability under the Charters by reason of, or arising out of, this Agreement and shall not be obligated to perform any of the obligations of the Shipowner under the Charters.

\*　　\*　　\*　　\*　　\*　　\*

> 3.2 The Charterer agrees that the Charters and all of the terms, covenants and provisions thereof and all rights, remedies and options of Charterer thereunder (other than its rights to terminate the Charters in accordance with the express terms of the Charters and its right in personam against the Shipowner) shall be and shall at all times continue to be subject and subordinate in all respects to each of the Mortgages and to the respective liens thereof.

Under the Depository Agreement, Chemical agreed to receive the charter hire. Chemical was to transfer to SA any charter hire paid by Lykes no later than one business day after the funds became available, unless MARAD notified Chemical of a demand upon MARAD's Title XI guarantees

on the Vessel. After receiving notice of a demand upon MARAD's guarantees, Chemical was to hold charter hire payments subject to MARAD's instructions.

The MARAD/Lykes Agreement provided, *inter alia,* that MARAD could exercise any of its rights as mortgagee in the event of default under the mortgages, but that MARAD would do so with a minimum disruption to Lykes. The Charters were subordinate to MARAD's mortgages.

As mortgagee, MARAD had the right upon default to take possession of and "hold, lay up, lease, charter, operate, or otherwise use" the Vessels.

On November 24, 1986 ("Petition Date"), SA filed its voluntary petition under chapter 11 of Title 11, United States Bankruptcy Code (the "Code"). SA continued to operate its business as a debtor-in-possession in accordance with § 1107 of the Code.

SA made no payment on its Title XI debt after the Petition Date. Its last Title XI payment was the July 1, 1986 semiannual payment, in the principal amount of $292,-000, on the 1967 Ship Mortgage. On February 26, 1987, MARAD received the first demand upon its Title XI guarantees on the Vessels. Pursuant to the Depository Agreement, MARAD instructed Chemical to hold for MARAD's account all charter hire deposited by Lykes.

Chemical stopped transferring charter hire deposits to SA but refused, when requested, to transfer the deposits directly to MARAD without a court order.

After discussions between SA and MARAD, SA acknowledged that MARAD should receive all charter hire that Lykes paid after MARAD received the demand on its guarantees, including charter hire paid before MARAD notified Chemical of the Title XI demand pursuant to the Depository Agreement.

MARAD and SA signed a Stipulation and Order Providing for Repayment of charter hire (the "Charter Hire Stipulation" or "Stipulation") requiring Chemical to disburse all Lykes charter hire as MARAD may direct and providing that SA would pay MARAD $126,000 for charter hire

transferred to SA after MARAD received the Title XI demand but before MARAD notified Chemical of that demand.

The Stipulation was conditioned only upon court approval, and the parties set no time limit for obtaining the requisite court approval.

At the June 25, 1987 hearing to approve the Charter Hire Stipulation, the only objecting party was Chemical, which, as a creditor of SA, argued that SA could set off the charter hire against ODS payments due SA from MARAD. The hearing was adjourned pending further resolution of Chemical's objection.

MARAD and Chemical tried to negotiate a settlement of Chemical's objection to the Stipulation. An issue of some importance to Chemical was MARAD's cooperation in a sale of the ARGO that would leave unaffected the TBT Leases and the letters of credit issued by Chemical in favor of the holders of the TBT Leases. Such a sale was unlikely to occur before late 1989, upon expiration of the Charters. At MARAD's request, Chemical agreed to pay interest on the depository account while the matter was pending.

On October 9, 1987, Lykes requested that MARAD extend the subsidizable life of the Vessels beyond the statutory 25–year limitation. Lykes would not make additional investments in the Vessels if they would be unavailable for Lykes' subsidized routes for a sufficient time to justify the expenditures. Lykes' option to terminate the Charters at the end of the first year was extended pending MARAD's decision. On December 7, 1987, MARAD agreed to extend the subsidizable life of each Vessel for three years. Lykes did not exercise its option to terminate the Charters.

During the term of the Charters, MARAD paid Lykes approximately $36.5 million in ODS in connection with Lykes' operation of the Vessels.

On December 31, 1987, MARAD filed a proof of claim for amounts due on the 1967 Ship Mortgage and the 1983 Fleet Mortgage. The proof of claim included the approximately $2.4 million that Chemical held

in the depository account. SA never contested the validity, priority or amount of MARAD's mortgages on the Vessels.

The 1967 Ship Mortgage and the 1983 Fleet Mortgage were valid and perfected preferred mortgages under the Ship Mortgage Act, 1920. SA had no equity in the Vessels.

On March 23, 1989, SA's Second Amended and Restated Disclosure Statement ("Disclosure Statement") was approved.[1] On May 16, 1989, SA's First Amended and Restated Joint Plan of Reorganization ("Plan") was confirmed.

In conjunction with the plan, SA unqualifiedly assumed the Charters, which still required payment of the charter hire to Chemical.

MARAD did not object to confirmation of the Plan or to assumption of the Charters.

In August 1989, SA informed MARAD that it intended to seek recovery of the charter hire on the theory of a voidable preference and/or fraudulent conveyance.

After the Charters expired, the Vessels were sold to Lykes pursuant to a court order dated December 13, 1989. The sale was structured to keep the TBT Leases in place and prevent drawdown of the letters of credit securing SA's guarantees of the tax benefits. Lykes gave MARAD a $9.3 million note to purchase the Vessels, and SA remained liable for any deficiency under the 1967 Ship Mortgage and the 1983 Fleet Mortgage.

MARAD's Title XI deficiency on the Vessels, as of April 30, 1990, was $10,972,201.60.

The balance in the Lykes charter hire depository account at Chemical, as of April 30, 1990, was $9,717.328.22.

## DISCUSSION

### A. *Sovereign Immunity*

An action under 11 U.S.C. § 547(b) to recover an alleged preferential transfer from a governmental unit requires a waiver of sovereign immunity. *Hoffman v. Connecticut Dept. of Income Maintenance (In re Willington Convalescent Home, Inc.),* 850 F.2d 50, 55 (2d Cir.1988), *aff'd,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). In section 106(a) of the Code, Congress provided a limited waiver of sovereign immunity pursuant to which, unless satisfied, governments still enjoy immunity from suit:

A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

11 U.S.C. § 106(a).

In the instant case, the parties agree that sovereign immunity is waived when the following three requirements are satisfied: (1) the claim against the governmental unit is property of the estate; (2) the governmental unit filed a claim against the estate; and (3) the claim against the governmental unit arises out of the same transaction or occurrence from which the governmental unit's claim arises. *In re Malmart Mort. Co.,* 109 B.R. 1, 3 (Bankr. D.Mass.1989). *See also In re Prudential Lines Inc.,* 79 B.R. 167, 180–81 (Bankr. S.D.N.Y.1987.)

The standard found in § 106(a) mirrors the compulsory counterclaim rule found in Rule 13 of the Federal Rules of Civil Procedure,[2] which provides in part as follows:

(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adju-

---

1. This case was originally assigned to the Honorable Howard C. Buschman, III and subsequently transferred to this Court.

2. The legislative history of § 106(a) indicates that it applies to compulsory counterclaims as defined in the Federal Rules of Civil Procedure. S.Rep. No. 989, 95th Cong., 2d Sess. 29–30 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 5815–16.

dication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed.R.Civ.P. 13(a).

In determining whether a claim and opposing claim arise out of the same "transaction or occurrence," the Second Circuit requires a finding of a "logical relationship" between the claims. *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979); *United Artists Corp. v. Masterpiece Productions, Inc.,* 221 F.2d 213, 216 (2d Cir. 1955). The logical relationship test used by the Second Circuit reflects the Circuit's broad and flexible interpretation of the compulsory counterclaim rule. *United States v. Aquavella,* 615 F.2d at 22. This Circuit clearly does not require an "absolute identity of factual backgrounds." *Id.*

The logical relationship test requires a finding that "the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978). Another court stated that the logical relationship standard calls for a showing that the opposing claim arises from the same aggregate of operative facts as the initial claim. *In re Lile,* 96 B.R. 81, 85 (Bankr.S.D. Texas 1989).

In the instant case, SA's claim against MARAD falls within the definition of a compulsory counterclaim. Both MARAD's claim and the Debtor's preference claim assert rights to the same matter: the charter hire. MARAD indirectly asserts its right, under the Assignment and the Depository Agreement, to obtain the deposited charter hire (and the right to set off funds in the depository account against MARAD'S mortgage debt), while the Debtor seeks to avoid the Assignment and the Depository Agreement as preferential transfers to MARAD and asserts its right to recover the same funds. MARAD's proof of claim (No. 11222) against the Debtor, not only asserts that the Debtor owes MARAD $20,891,618.55 pursuant to the Title XI Guarantees and Preferred Mortgage, but MARAD also seeks to set off its debt against the $2,353,933.10 then held by Chemical in the depository account under the Assignment and the Depository Agreement.

MARAD posits that it did not waive governmental immunity because its claims "relate only indirectly to the Assignment, which is the alleged preference and/or fraudulent conveyance, in that the Assignment was additional security for the mortgages." United States Memorandum in Support at 20.

Congress intended to prevent a governmental unit from receiving a "distribution from the estate without subjecting itself to any liability it has to the estate arising from the same transaction or occurrence upon which its distribution is based." *In re Prudential Lines, Inc.,* 79 B.R. at 180; *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1972); S.Rep. No. 989, 95th Cong., 2nd Sess. 29–30 (1978). The instant scenario is just the sort which Congress sought to avoid. The claims at issue before this Court are so integrally related that the opposing claim must be deemed to be a compulsory counterclaim in light of the stated test and in the interests of judicial economy.

MARAD objects to the characterization of the opposing claim as a compulsory counterclaim insomuch as MARAD's claims are based on the 1967 Ship and the 1983 Fleet Mortgage and SA's opposing claim arises from the Assignment and Depository Agreement. MARAD seeks to focus only on the fact that the mortgages are separate from, albeit related to, the Assignment and Depository Agreement. Granted, if the claims at issue arose from the same agreement, undeniably, the claims would satisfy the logical relationship test. But the logical relationship test does not require that the claims arise from the same agreement. In the instant case, MARAD included in its proof of claim a setoff representing the money in the depository account as of a date certain. In doing so, MARAD itself recognized the integral relation between its claim on the mortgages and its claim pursuant to the Assignment and Depository Agreement.

**B.** *Timeliness of this Adversary Proceeding*

■ Section 546(a) of the Code provides that avoidance actions may not be commenced after the earlier of:

(1) two years after the appointment of a trustee . . .; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a)(1). The Debtor had until the close of this case to commence this adversary proceeding. *Korvettes, Inc. v. Sanyo Electric, Inc. (In re Korvettes, Inc.),* 67 B.R. 730, 734 (S.D.N.Y.1986); *Caplan v. U.S. Brass & Copper Co. (In re Century Brass Products, Inc.),* 127 B.R. 720 (Bankr.D.Conn.1991) (citing *In re Korvettes* as the law of the second circuit); *contra Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990) (holding that § 546(a)(1) is ambiguous and that Congress intended the two-year limitation applying to appointed trustees to apply as well to their functional equivalents—debtors-in-possession). Since this case is still open, this preference action is certainly timely.

**C.** *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions of files, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court held in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the standard for ruling on a summary judgment is similar to that of a directed verdict if under governing law

there can be but one reasonable conclusion. In addition the Supreme Court noted, in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), that "the mere existence of some alleged factual dispute between the parties *will not* defeat an otherwise properly supported motion for motion for summary judgment; the requirement is that there be no genuine issue as to any material fact." *Id.* (emphasis added). Material facts have been defined as those whose resolution will be determinative of the outcome. *See also Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.),* 76 B.R. 297, 300 (Bankr.S.D.N.Y.1987).

The pleadings and accompanying documents filed in connection with the instant motions establish that no genuine dispute exists as to any material facts set forth in the parties' respective local rule 13(h) statements. Rather, summary judgement is appropriate because the parties are in agreement as to the relevant facts.

**D.** *Debtor's Cause of Action Based on the Fraudulent Conveyance Sections 273 and 274 of the New York Debtor and Creditor Law*

The Debtor, in its complaint, contends that the Assignment was a fraudulent conveyance pursuant to §§ 273 [3] and 274 [4] of the New York Debtor and Creditor Law ("DCL") and § 544 of the Code.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), incorporated into bankruptcy proceedings by Bankruptcy Rule 7012(b), MARAD moves to dismiss the Debtor's cause of action based upon the fraudulent conveyance sections 273 and 274 of the DCL. The Debtor, however, does not seek summary judgment on this cause of action. Even had the Debtor included this cause of

---

**3.** Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration. N.Y. Debtor and Creditor Law § 273 (McKinney 1990).

**4.** Every conveyance made without fair consideration when the person making it is engaged or

is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonable small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent. N.Y. Debtor and Creditor Law § 274 (McKinney 1990).

action in its summary judgment motion, this Court need not reach the merits of this issue since a determination can, and will, be made based alone on the Debtor's other causes of action set forth in the complaint. Accordingly, MARAD's motion to dismiss the Debtor's cause of action based on the fraudulent conveyance sections 273 and 274 of the DCL is dismissed.

### E. Preferential Transfer

SA claims that the Assignment and Depository Agreement are voidable preferential transfers falling within the parameters of section 547(b) of the Code. Section 547(b) was intended to facilitate and insure the equality of distribution among the creditors of a debtor and to avoid and deter a race among the creditors to deplete the assets of the estate prior the bankruptcy filing. *Mandross v. Peoples Banking Company (In re Hartley)*, 825 F.2d 1067, 1069 (6th Cir.1987). A transfer of an interest of a debtor's property is deemed to be a preference where the following five elements are satisfied:

1. It is made for the benefit of a creditor;
2. It is made for or on account of an antecedent debt owed by the debtor before such transfer was made;
3. It is made while the debtor is insolvent;
4. It is made on or within 90 days before the date of the filing of the petition; and
5. Said transfer enables the benefited creditor to receive more than such creditor would have received had the case been a chapter 7 liquidation and the creditor had not received the transfer.

*See* 11 U.S.C. § 547(b).

MARAD contests the satisfaction of the third element, that the transfer was made while the Debtor was insolvent and the last element, whether MARAD received more than it would have been entitled to under a chapter 7 scenario. Additionally, MARAD argues that the preference concept does not apply in this context because the trans-

fer did not diminish the estate to the prejudice of the creditors. Finally, MARAD asserts that, assuming arguendo that the transfer is found to be preferential, the exceptions found in section 547(c) apply.

The other elements to a preference cause of action have undeniably been satisfied. The Assignment and Depository Agreement were transfers to or for the benefit of MARAD, a creditor, since MARAD received all rights and interests to the charter hire. (*See* Assignment Article 1.1). The Assignment and Depository Agreement were made on account of an antecedent debt, MARAD's pre-existing mortgage debt. And the Assignment and Depository Agreement were executed on November 4, 1986, within 90 days of the Petition Date.

1. Was the Debtor Insolvent at the Time of the Transfer?

■■■ Pursuant to section 547(f), a debtor enjoys the presumption of insolvency during the ninety (90) days prior to the bankruptcy filing. *See* 11 U.S.C. § 547(f). The party against whom the presumption rests, must rebut the presumption of insolvency. *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1322 (9th Cir.1989). Section 101 of the Code defines, in pertinent part, insolvency "as a financial condition such that the sum of such entity's debt is greater than all of such entity's property, at *fair valuation....*" 11 U.S.C. § 101(31)(A) (emphasis added). In determining insolvency, the balance sheet analysis is applied: whether the debtor's assets exceed its liabilities. *In re Koubourlis*, 869 F.2d at 1321; *Jahn v. Fassnacht (In re A. Fassnacht & Sons, Inc.)*, 826 F.2d 458, 462 (6th Cir.1987).

■■■ MARAD attempts to rebut the statutory presumption of insolvency by asserting that the entry for paid-in-capital in the Debtor's October and November 1986 financial statements (Plaintiff's Exhibit "J") should be excluded from the insolvency analysis because that is not a liability. Once the paid-in-capital is excluded, the Debtor's assets exceeds its liabilities.

In its analysis, MARAD relies on the book value of the Debtor's assets as provided in the October and November 1986 financial statements. When determining solvency, section 101(31) provides that the value of the assets which is taken into account is the "fair value". Fair value means neither forced sale nor going concern value, rather it refers to:

> [T]he amount of money that the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonable prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts.

*Jahn v. Reading Body Works, Inc. (In re A. Fassnacht & Sons, Inc.)*, 45 B.R. 209, 217 (Bankr.E.D.Tenn.1984); *see also, DeRosa v. Buildex Inc. (In re F & S Cent. Mfg. Corp.)*, 53 B.R. 842, 849 (Bankr. E.D.N.Y.1985) ("Fair value is determined by estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.") It stands to reason that the cost or book value is not presumptively the equivalent to fair value. *In re H & S Transp. Co.*, 110 B.R. 827 (M.D.Tenn.1990), *aff'd* 939 F.2d 355 (6th Cir.1991) (debtor's schedules not relied upon by the court where it was shown that the figures therein did not represent fair value.); *Excello Press, Inc. v. Bowers, Inc. (In re Excello Press, Inc.)*, 96 B.R. 840, 842–43 (Bankr.N.D.Ill.1989); *accord, Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 995 (2d Cir.1981); *In re F & S Cent. Mfg. Corp.*, 53 B.R. at 849 (balance sheet which does not indicate that debtor's assets were valued at fair value has no probative weight for determining insolvency notwithstanding the fact that it was in accordance with generally accepted accounting principals), *accord, Plihal v. First Nat. Bank (In re Plihal)*, 97 B.R. 554, 557 (Bankr.D.Neb.1989). It is true that if the paid-in-capital figure were not included in the Debtor's October and November financial statements, the Debtor would not pass a balance sheet insolvency analysis. However, this fact does not indicate that under a fair value approach the Debtor would not meet the insolvency criteria. Insofar as the October and November 1986 financial statements reflect the assets valued at cost they are inaccurate measures of insolvency. *Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833, 838 (5th Cir.1983); *Pryor v. Cohen (In re Blue Point Carpet, Inc.)*, 102 B.R. 311, 320 (Bankr.E.D.N.Y.1989).

Even if MARAD had successfully rebutted the insolvency presumption, the matter could be resolved without resort to disputed material facts because of the December financial statement which presents the Debtor's assets at fair value. Straub Affidavit at ¶ 3.

"Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other factors from which the ultimate fact of insolvency on the transfer date must be inferred or presumed." *Hassan v. Middlesex County Nat. Bank*, 333 F.2d 838, 840 (1st Cir.), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); *Bartl v. Twardy (In re Claxton)*, 32 B.R. 224, 232 (Bankr.E.D.Va. 1983). Where it is established that a debtor was insolvent at a date subsequent to the date of transfer, and where it is further shown that the debtor's financial condition had not changed substantially from the date of the transfer to said subsequent date, then insolvency at the prior time can be inferred from the actual and proven insolvency at the later date. *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 301 (Bankr.D.Mass.1983), *aff'd*, *Briden v. Foley*, 776 F.2d 379 (1st Cir. 1985); *Seligson v. New York Produce Exchange*, 394 F.Supp. 125 (S.D.N.Y.1975); *Young v. Scandore Paper Box Corp. (In re Lucasa Int'l, Ltd.)*, 13 B.R. 596, 600 (Bankr.S.D.N.Y.1981).

The December 31, 1986 financial statement presents a more accurate picture of the Debtor's financial condition at the time of the transfer, on November 4, 1986, than either the October or November cost-based financial statements. The December financial statement reflects a restated value of the Debtor's financial condition. As conceded by MARAD, the December financial

statement shows the debtor's insolvency. MARAD Memorandum at 11. It appears that the Debtor's financial condition did not change substantially from the November 4, 1986 date of the Assignment to the date of the December financial statement. Straub Affidavit at ¶ 5. Therefore, notwithstanding MARAD's attempt to create an issue, the Debtor's insolvency can be traced back to the date of the transfer.

2. Did the Transfer Involve Property of the Estate?

██ A transfer is preferential only if the property or the interest in the property transferred belongs to the debtor. *Coral Petroleum Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355–56 (5th Cir.), *reh'g denied*, 801 F.2d 398 (5th Cir.1986). The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate. *Id.*

MARAD states that the assignment did not deplete the property of the estate because: (1) the Debtor's right to bareboat charter the Vessels was of no value to its unsecured creditors in light of MARAD's authority to consent; (2) assets over which the Debtor had no control could not be the subject of a preference because of the earmark doctrine; and (3) the Assignment merely continued, albeit in a different form, MARAD's pre-existing lien on the Debtor's possessory rights in the Vessels.

2.a. SA's Right to Charter the Vessels to Lykes Absent the Assignment

MARAD claims that the Assignment did not transfer property of the estate since the Debtor had no right to charter the Vessels without MARAD's consent and since nothing prevented MARAD from conditioning its consent to the Charters and its agreement to amend Lykes' ODS Contract upon assignment of the Charters as additional security for the mortgages. MARAD claims that the Debtor transferred to MARAD the right to enter into charter agreements as security long before the preference period. MARAD claims it would not have permitted the Debtor to charter the Vessels without the Assign-

ment, Bowman Aff. ¶ 6, and Lykes would not have chartered the Vessels unless MARAD consented and agreed to modify the ODS Contract. List Aff. ¶ 2. MARAD concludes that absent the Assignment, the conditions precedent to the agreement to Charter could not have been satisfied. In short, MARAD views the Assignment as *sine qua non* of the Charters.

██ A preference involves "any transfer of an interest of the debtor in property." 11 U.S.C. § 547(b). The term "property of the estate" is expansive and "has been given an extremely broad interpretation under the Bankruptcy Act, encompassing 'anything of value which has debt-paying or debt-securing power." *Klein v. Tabatchnick*, 459 F.Supp 707, 716 (S.D.N.Y.1978). The Debtor did indeed grant to MARAD the right to consent to any a bareboat chartering of the Vessels. But this was not what the Debtor transferred when it entered into the Assignment. What was transferred was the Debtor's right to receive charter hire. When the Debtor granted MARAD's security interest in the Vessels, the Debtor was left only a conditional right to engage in bareboat chartering, but it did not relinquish its rights to receive any charter hire. The Debtor transferred its right to receive the charter hire when it signed, within the preference period, the Assignment. *Cf. Goldstein v. Madison Nat. Bank*, 89 B.R. 274 (D.D.C.1988) (assignment of debtor's entitlement to certain future payments was not a preference where the assignment was absolute (as opposed to an assignment for security interest) and made outside the 90 day period, notwithstanding the fact that the future payment was to be paid within the 90 day period). To the extent that MARAD is arguing that prior to the preference period it held a perfected security interest in the charter hire, its argument is rejected by this Court later in this opinion. *See infra* at 261. Under maritime law, absent clear language to the contrary, a mortgage secured under the Ship Mortgage Act, 1920 does not extend to the freight of a vessel. *See,* Ship Mortgage Act 46 U.S.C. §§ 911 et seq.; *In re Levy–*

*Mellon Marine,* 61 B.R. 331, 334 (Bankr. W.D.La.1986); *accord, Layne & Bowler Corp. v. United States Shipping Bd. Emergency Fleet Corp.,* 27 F.2d 39, 41 (9th Cir.1928); *United States v. Sterling,* 22 F.2d 323, 325 (S.D.N.Y.1927); *Freights of the Kate,* 63 F. 707 (S.D.N.Y.1894). None of MARAD's mortgages specifically provide that MARAD's security interest runs to freight or charter hire and therefore MARAD did not hold such an interest. However, MARAD argues that it had a security interest in the Debtor's ownership in the Vessels which is the same as a security interest in any charter hire generated. This argument fails because all that MARAD possessed was a right to block any bareboat chartering through its "veto" powers. If the Debtor were to act without MARAD's consent, MARAD would have the right to foreclose on its collateral due to an event of default by the Debtor. MARAD did not automatically and expressly have a right to the charter hire at the time its various mortgages were executed, it gained this right only through the Assignment.

Even if what was transferred in the Assignment was the Debtor's right to bareboat charter, MARAD's argument fails nevertheless. The Debtor's right to bareboat charter was essentially conditioned on MARAD's consent. MARAD argues that the conditional nature of the Debtor's right made it valueless to the Debtor and its general creditor body and therefore a transfer of said right did not in any way deplete the assets of the Debtor's estate.

This Court finds MARAD's argument unpersuasive. The Debtor's conditional right to bareboat charter was certainly of value. A bareboat charter would indeed bring charter hire into the estate since MARAD's security interest did not extend to charter hire. The only authority cited by MARAD in support of its position is *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 56 B.R. 339, 387–88 (Bankr.D.Minn.1985), *aff'd in part, remanded in part,* 850 F.2d 1275 (8th Cir. 1988), where the court of appeals found certain contracts to be worthless where they contained restrictions on assignment conditioned upon another party's consent that could be reasonably or unreasonably withheld. The *Bellanca* court made this finding in the context of an insolvency evaluation where it had to determine the value of contracts containing a restriction on assignment. The *Bellanca* decision is distinguishable because in the case *sub judice* the issue of the value of the Debtor's right to bareboat charter is not in the context of an insolvency dispute where indeed this Court would be called upon to ascribe a definite value to this right. MARAD is claiming that because the value of the Debtor's conditional right to bareboat charter was not fixed prior to the time the Assignment and Depository Agreement were executed, such right has no value.

This Court is not convinced that the Debtor's right to bareboat charter was valueless. It certainly had value, the value of the potential bareboat charters and charter hire notwithstanding MARAD's power to consent because, as discussed above, the Debtor had a right to any charter hire generated. This value, while not fixed prior to the time the Assignment and Depository Agreement were entered into, could have been liquidated at any time simply by looking to the market for bareboat chartering.

Additionally, MARAD claims that without its consent there would be no charter hire and therefore there was a sort of quid pro quo transaction that did not deplete the assets of the estate to the detriment of the creditors of the Debtor. However, what concerns this Court is the fact that the charter hire was not placed into the depository account for immediate payment to MARAD; instead the Debtor was free to use the funds, and did in fact use the funds until (a) it defaulted and (b) MARAD successfully enforced its Assignment. Once MARAD approved the Charter, any charter hire generated did become property that was available to the Debtor's creditor body and which could be assigned away.

## 2.b. The Earmark Doctrine

■ The earmark doctrine is a judicially created exception to preference actions.

The fundamental concept underlying the earmark doctrine is that in situations where the debtor never had actual control over certain funds or assets, said funds or assets never became part of the bankrupt's estate available for distribution to the creditors of the estate and accordingly, a transfer of those assets or funds would not be preferential. *Smyth v. Kaufman*, 114 F.2d 40, 42 (2d Cir.1940); *Coral Petroleum Inc.*, 797 F.2d at 1351. This doctrine is almost exclusively applied where a third party loans money to a debtor for the very specific purpose of repaying a designated debt. The funds are sometimes transferred to the creditor whose obligation is being satisfied, but the court in *Coral Petroleum Inc.* observed that the doctrine may still apply where the debtor physically receives control of the funds but the debtor lacks dispositive control over the funds. *Id.* at 1361.

MARAD states that the Debtor could not control disposition of the assets transferred to MARAD since MARAD could impose any condition upon release of that power, and, therefore the Charters created pursuant to the conditions MARAD imposed were never assets of the estate. This circular reasoning fails to fully and logically explain how the earmark doctrine applies in this case. First, MARAD is attempting to apply a doctrine which has been applied in cases with very different facts.

> In every earmarking situation there are three necessary dramatis personae. They are the 'old creditor' (the pre-existing creditor who is paid off within the 90–day period prior to bankruptcy), the 'new creditor' or 'new lender' who supplies the funds to pay off the old creditor, and the debtor.

*McCuskey v. Nat. Bank (In re Bohlen Enterprises, Ltd.)*, 859 F.2d 561, 565 (8th Cir.1988). Here, MARAD would be the old creditor but Lykes, the third party involved who is paying the charter hire which is to go to MARAD, is not a new creditor. Lykes is not seeking to have MARAD's

debt satisfied and become a creditor of the Debtor's. To the contrary, rather than being owed money, Lykes owes money to the Debtor. Therefore, this case does not have the appropriate players in order to have an earmark situation.

Moreover, the earmark doctrine does not apply for a second and more fundamental reason: the Debtor did indeed exercise control over the charter hire. As stated above, it is because the debtor lacks control over the disposition of the funds that a court will find that the estate is not depleted in an earmark situation. Where a debtor never had access to certain funds, the funds were never available to the debtor's creditors. *In re Bohlen Enterprises, Ltd.*, 859 F.2d at 565; *Coral Petroleum Inc. v. Banque Paribas–London*, 797 F.2d at 1359. In this case, undeniably the Debtor had control over the charter hire from the time the Charters were executed until such time when MARAD placed a hold on the depository account. The charter hire would have been removed from the Debtor's control had MARAD exercised its rights prior to the Petition Date,[5] but this is not the case. This fact alone works to preclude the application of the earmark doctrine.

### 2.c. The Extent of MARAD's Security Interest

Finally, MARAD argues that the Assignment did not deplete the property of the estate because the property was embraced within MARAD's security interest in the Vessels. MARAD does not attempt to argue that its security interest ran to the freight or charter hire since the mortgages did not specifically provide for that. *See,* Ship Mortgage Act 46 U.S.C. §§ 911 et seq.; *In re Levy–Mellon Marine*, 61 B.R. at 334; *accord Layne & Bowler Corp. v. United States Shipping Bd. Emergency Fleet Corp.*, 27 F.2d at 41; *United States v. Sterling*, 22 F.2d at 325; *Freights of the Kate*, 63 F. 707 (S.D.N.Y.1894). Instead, MARAD claims that it had a secured interest in the Debtor's title in the Vessels as

---

**5.** Even if that had been the case, the issue of whether the Assignment is a preferential transfer would still exist.

well as the Debtor's possession of the Vessels, as evidenced by the restriction in the Debtor's ability to charter the Vessels absent MARAD's consent. MARAD concludes that in effect what the Assignment achieved was to transfer MARAD's security interest in the Debtor's possession of the Vessels for Lykes' possession of the Vessels. MARAD seems to view the transfer as an even exchange. But this cannot be the case since the Assignment and Depository Agreement gave MARAD a security interest in the freight generated by the Vessels, a right which MARAD did not otherwise enjoy. Surely, MARAD always enjoyed the power of consent to the bareboat chartering of the Vessels, but this does not necessarily translate into a security interest in any charter hire generated by the charters approved by MARAD. A negative covenant, such as the Debtor's agreement not to bareboat charter the Vessels without MARAD's consent, is nothing more than an agreement to forbear from acting; it does not create a perfected security interest valid against a debtor in possession or trustee under the Code. *In re Continental Resources Corp.*, 43 B.R. 658, 662 (Bankr.W.D.Okl.1984), *aff'd sub. nom. Continental Illinois Nat. Bank v. FDIC*, 799 F.2d 622 (10th Cir.1986); *In re Allegheny Int'l Inc.*, 93 B.R. 907, 909–910 (Bankr. W.D.Pa.1988); *In re Friese*, 28 B.R. 953, 954 (Bankr.D.Conn.1983). If MARAD had wanted to secure an interest in charter hire, it should have specifically provided for that in its mortgage and security agreements. MARAD will not get at this point in time what it did not originally secure for itself.

 All that MARAD received in the Debtor's negative covenant not to bareboat charter absent MARAD's consent was the right to foreclose on its collateral in the event that the Debtor defaulted, not a security interest in the Charters and/or charter hire.

### 3. Did MARAD Receive More Than it Would Have in a Chapter 7?

 In order to satisfy the last element of a preferential transfer the Debtor must prove that the Assignment enabled MARAD to receive more than it would have if the Debtor had not assigned the Lykes Charters to MARAD and if the Debtor had been liquidated on the date of transfer with MARAD receiving payment of its mortgage debt to the extent provided by the Code. 11 U.S.C. § 547(b)(5).

"Generally payments to a fully secured creditor will not be considered preferential because the creditor would not receive more in a chapter 7 liquidation.... (footnote omitted) Payments to a partially secured creditor from property not covered by its lien, however, have a preferential effect, because in a chapter 7 liquidation, that creditor would receive a distribution for its lien in addition to the payments already received." 4 *Collier on Bankruptcy* ¶ 547.08 at 547–43 (15th ed. 1990); *Braunstein v. Eastern Airlines Employees Federal Credit Union (In re Fitzgerald)*, 49 B.R. 62, 65 (Bankr.D.Mass.1985). Transfers that change the status of the creditor from undersecured to fully secured are preferential where evidence indicates that no unsecured creditor would receive full payment on liquidation. *Porter v. Yukon Nat. Bank*, 866 F.2d 355, 359 (10th Cir.1989).

The Debtor claims that had the Assignment not existed on the Petition Date and had the estate been liquidated on that day, MARAD would not have received the charter hire since its security interest did not encompass the charter hire. MARAD counters by stating that had the Debtor's estate been liquidated on the Petition Date, it would have received no more than it did pursuant to the Assignment because the chapter 7 trustee would have abandoned these Vessels to MARAD in the liquidation process. MARAD argues this would have been the inevitable result since the Debtor did not have equity in the Vessels (MARAD was undersecured) and the trustee would have been compelled to turnover the Vessels or MARAD would have moved to lift the stay which would have been granted since the Debtor did not have equity in the Vessels and did not need them for an effective reorganization. Once having received possession of the Vessels, MARAD claims

that it would have exercised the right to charter them itself and thereby would have received the charter hire. MARAD also points out that it did not receive actual cash from the Assignment prior to the Petition Date but rather was granted additional security interest.

When determining whether a creditor received more than it would have in a chapter 7, events that could possibly occur outside of the bankruptcy are not relevant. *See, Gosch v. Burns (In re Finn),* 86 B.R. 902, 904 (Bankr.E.D.Mich. 1988), *rev'd on other grounds,* 909 F.2d 903 (6th Cir.1990). What is at issue is what MARAD would have received directly from the liquidation, and not speculation as to MARAD's lost opportunity cost outside of bankruptcy had the Vessel been turned over to MARAD. What is relevant is that MARAD, an undersecured creditor, managed to enhance its security cushion through the Assignment to the extent that MARAD became entitled to the charter hire in addition to its pre-existing security interest in the Vessels. Transfers made to undersecured creditors will be deemed to be made in satisfaction of the creditor's unsecured portion. *See* 4 *Collier on Bankruptcy* ¶ 547.08 at 547–43 (15th ed. 1990). The Assignment was a preferential transfer and was MARAD's attempt to decrease its undersecured position.

### F. *Exceptions to the Debtor's Avoiding Powers*

#### 1. The New Value Exception

Section 547(c)(1) of the Code excepts from a debtor's avoiding powers transactions which are contemporaneous exchanges for new value. Section 547(c)(1) provides in pertinent part:

The trustee may not avoid, under this section, a transfer—

(1) To the extent that such transfer was—

(A) Intended by Debtor and the Creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the Debtor; and

(B) In fact a substantially contemporaneous exchange....

11 U.S.C. § 547(c)(1). New value is defined in the Code as:

... money or money's worth in goods, services or new credit, or release by a transferee in a transaction that is neither void nor voidable by the Debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation....

11 U.S.C. § 547(a)(2).

MARAD, bears the burden of establishing that the Assignment and the Depository Agreement fall within an exception under section 547(c) to the Debtor's avoidance power. *See Sorenson v. Tire Holdings Ltd. Partnership,* 108 B.R. 752, 758 (Bankr.D.Kan.1989); *Charisma Inv. Co., N.V. v. Air Florida System, Inc.,* 68 B.R. 596, 600 n. 4 (S.D.Fla.1986), *aff'd sub nom,* 841 F.2d 1082 (11th Cir.1988).

MARAD asserts that it provided new value for the Assignment by consenting to the Charters and by amending the Lykes' ODS contract. MARAD reasons that by consenting to the Charters, MARAD released a lien created prior to the preference period by the mortgages, the 1981 CDS Contract and the Debtor's ODS Contract. MARAD further reasons that by amending the Lykes' ODS contract, MARAD made the Charters economically feasible, and thus indirectly provided new value in the form of the Charters themselves.

Despite MARAD's valiant attempt to keep the Assignment out of the reach of the Debtor's avoiding powers, the transaction does not come within the protections of the exceptions because MARAD did not give new value. In essence all that MARAD did was agree to forbear from proceeding with default actions against the Debtor pursuant to the terms of the various mortgages. Courts have consistently found that forbearance does not to constitute "new value" under section 547(a)(2). *See American Bank of Martin County v. Leasing Service Corp. (In re Air Conditioning, Inc.),* 845 F.2d 293, 298 (11th Cir.

1988), *cert. denied* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C.Cir.1986) (forbearance from foreclosing on collateral did not constitute new value); *Bavely v. Merchants Nat. Bank (In re Lario)*, 36 B.R. 582, 584 (Bankr. S.D.Ohio 1983) (court held that by agreeing to forbear the creditor was merely exercising a pre-existing right and not giving new value).

Nor did MARAD release a lien in exchange for consideration by the Debtor because, as discussed above, MARAD did not have a security interest in the charter hire prior to the preference period. *Cf. In re George Rodman Inc.*, 792 F.2d 125, 128 (10th Cir.1986) (creditor holding a perfected materialman's lien provided new value by releasing the lien).

### 2. The Improvement in Position Test

■ MARAD also attempts to apply section 547(c)(5) [6] which codifies the "improvement in position test". MARAD claims to have held a secured interest in the Debtor's account receivable for the charter hire. This exception is aimed at a creditor holding a security interest or "floating lien" on the debtor's inventory or receivable. 4 *Collier on Bankruptcy*, ¶ 547.13 at 547-60 (15th Ed.1990). The Code recognizes that a security interest does not attach and cannot be perfected in inventory or accounts receivable until the debtor acquires rights in them. If the secured party's position does not improve relative to what it was 90 days preceding bankruptcy, no preference has occurred. If a creditor's deficiency claim has decreased during the 90 day period *and* the decrease prejudiced other creditors holding unsecured claims, then the security interest in inventory or receivables acquired by the debtor during the 90 day period prior to bankruptcy will be a voidable preference to

the extent of the decrease in the deficiency that prejudices other creditors holding unsecured claims. *Id.* at 547-60-61.

■ This exception does not apply in this context because MARAD did not hold a floating lien. Moreover, section 547(c)(5) presupposes that the creditor had a perfected security interest prior to the 90 day preference period. 4 *Collier on Bankruptcy* ¶ 547.13 at 547-60 (15th ed. 1990). That was not the case here. MARAD obtained and perfected a security interest vis-a-vis the Assignment. The Assignment is an agreement, separate and apart from MARAD's mortgages.

### G. *The Debtor's Assumption of the Charters*

SA assumed the Charters pursuant to the Plan. The Charters expressly provided that charter hire be paid to a financial institution designated by MARAD for credit to MARAD's account pursuant to the Assignment. MARAD concludes that since the Debtor assumed the Charters it cannot at this late date attempt to modify the Charters. MARAD's reasoning is as follows:

1. the Charters expressly provided that charter hire be paid to a financial institution designated by MARAD for credit to MARAD's account pursuant to the Assignment;

2. these charter hire provisions have never been modified;

3. by assuming the Charters, SA assumed the burden of the charter hire payment along with the benefits resulting from keeping the TBT Leases in place;

4. the relief sought in this adversary proceeding would modify the charter hire payment provisions;

**6.** Section 547(c)(5) provides in pertinent part: the trustee may not avoid under this section a transfer—
 that creates a perfected security interest in inventory on a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the

petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt—
 (A)(1) ... 90 days before the date of the filing of the petition....

5. the Debtor has no power to unilaterally modify the Charters but must adhere to all of their provisions;

6. the assumption of the Charters by the Debtor was action manifesting an intention and desire to affirm them, thereby binding the Debtor to them.

The Debtor counters by pointing out that the Charters and the Assignment are two separate agreements and, while assuming the Charters, the Debtor did not in effect assume the Assignment.

 Once an executory contract is assumed, it is said to be assumed *cum onere*—with all of its benefits and burdens. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *Hurley v. Atchison, T. & S.F.R. Co.*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909); *In re Steelship Corp.*, 576 F.2d 128 (8th Cir.1978); *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3rd Cir.1951). However, MARAD's reliance on the *cum onere* principle is misplaced. A voidable preferential transfer will not be otherwise cleansed of its preferential taint by somehow being cleverly tied into a separate valid and unavoidable transfer or agreement. If this were true, any clever creditor could be preferred, in direct violation of the Code, but be removed from the debtor's avoidance powers by tying it into a separate valid transaction. MARAD seeks to put the Debtor's assuming powers and avoiding powers in direct conflict. MARAD's argument, if accepted, would mean that the Debtor could not enforce its legal right to avoid the Assignment, which has been found to be a preference, without also having to reject the Charters which generate money into the estate. This result, in these circumstances, would work a great injustice to the purpose and integrity of the Code. The result sought by MARAD flies in the face of one of the two policies which form the foundation of the Code: the equality of treatment amongst creditors.

It is true that once the Debtor assumed the Charters, it assumed its benefits along with its burdens. However, the *cum onere* principle does not provide that once assumed, every single provision of an agreement is enforceable by and against debtor; indeed the Code itself alters certain rights of the parties. *In re Nitec Paper Corp.*, 43 B.R. 492, 498 (S.D.N.Y.1984); *In re Orgell, Inc.*, 117 B.R. 574, 575–76 (Bankr.C.D.Ca.1990); *Rockland Center Associates v. TSW Stores of Nanuet (In re TSW Stores of Nanuet, Inc.)*, 34 B.R. 299, 304 (Bankr.S.D.N.Y.1983). *See*, Beinenstock, *Bankruptcy Reorganization*, 459 (1987). MARAD had the Assignment incorporated into the Charters. The Assignment, however, does not form the basis and purpose of the Charters. The burden which MARAD deems to have been assumed by the Debtor enures only to the benefit of MARAD, a non-signatory to the Charters. Lykes' involvement and dealings with MARAD were towards obtaining MARAD's approval of the charter of the Vessels. It is clear that Lykes had no interest in who ultimately received the charter hire. Since the Assignment and the Charters are two separate agreements, this Court will not deem the assumption of the Charters to constitute an assumption of the Assignment.

### H. *The Charter Hire Stipulation*

 Finally, MARAD raises the defenses of account stated, waiver, judicial, promissory and equitable estoppel. MARAD states that SA is estopped from avoiding the Assignment because in the postpetition Charter Hire Stipulation, the Debtor acknowledged that the charter hire paid by Lykes after MARAD made demand on its guarantees should be credited to MARAD.

#### 1. *Account Stated*

MARAD claims that the Stipulation is an account stated because SA examined MARAD's claims and agreed that MARAD was entitled to the money in the depository account as of a date certain. *See, Bank of New York–Delaware v. Santarelli*, 128 Misc.2d 1003, 1003–004, 491 N.Y.S.2d 980, 981 (1985).

#### 2. *Waiver*

MARAD claims that by entering into the Stipulation, the Debtor "intentionally and unambiguously relinquished [its] right to attack the Assignment as a preference."

United States' Memorandum in Support at 50. *See, Hadden v. Consolidated Edison Co.,* 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 275–76, 382 N.E.2d 1136, 1138–39 (1978). MARAD concedes that the Stipulation did not expressly address the preference issue, but claims that such waiver did not have to be express. MARAD infers intent not to pursue a preference action from the Debtor's action, *i.e.,* signing the Stipulation and waiting for more than two years thereafter before it commenced this preference action.

### 3. *Judicial Estoppel*

Judicial estoppel applies where "a party, after assuming a particular legal position in a legal proceeding, attempts to assume a contrary position." *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank (In re Galerie Des Monnaies of Geneva, Ltd.),* 55 B.R. 253, 259 (Bankr. S.D.N.Y.1985), *aff'd,* 62 B.R. 224 (S.D.N.Y.1986). MARAD claims that the Debtor should be estopped from pursuing this preference action because it made a representation in the Disclosure Statement that the Debtor believed that no voidable preferences had occurred, a position consistent with the Stipulation. MARAD posits that the Debtor had to have known of the possible preference action and deceived MARAD into a false sense of security.

### 4. *Promissory and Equitable Estoppel*

MARAD claims that SA's failure to challenge the Assignment as a preference until the Charters had nearly expired and almost three years' worth of charter hire had accumulated in the depository account deprived MARAD of the opportunity to pursue available alternatives if it had reason to think that its agreement with the Debtor might be set aside. Specifically, MARAD claims that it did not seek relief from the stay to assert its rights as mortgagee of the Vessels in light of the fact that Chemical's objection to the Stipulation was the only obstacle preventing MARAD from receiving the charter hire and that MARAD and Chemical and were working towards a resolution of Chemical's objection. MARAD speculates that upon obtaining relief from the stay, it would have chartered the Vessels to Lykes in order to maximize recovery of its mortgage debt.

Equitable Estoppel under New York law entails:

 i. Conduct which amounts to false representations or concealment of material facts which gives the impression that the facts are otherwise than asserted;

 ii. An intention or expectation that such conduct would be relied upon by the other party; and

 iii. Actual or constructive knowledge of real facts. *Eastern Sys. v. West 45th St. Ind. Condominiums, Inc.,* 105 B.R. 219, 234 (Bankr. S.D.N.Y.1989). The party asserting equitable estoppel must show: a lack of knowledge of the real facts; reliance on the conduct of the party to be estopped; and prejudicial change of position. *Id.*

The doctrine of promissory estoppel is similar but requires the allegation of a promise rather than inequitable conduct. *Id.* at 234 n. 4.

This Court denies MARAD's appeal to equity. This Court will not bind the Debtor to the Stipulation because the Stipulation has not been court approved. Although the Stipulation was presented to Judge Buschman for his approval, it seems that its merits were not considered by the court in light of Chemical's objections. The Debtor has always enjoyed the right to withdraw its participation in the Stipulation since it has not been recognized by a court. The account stated theory is not applicable because the issue is not the amount of indebtedness owed to a creditor but rather whether the transfer was preferential. Waiver does not apply because this Court will not infer from the Debtor's silence that it knowingly and affirmatively waived its right to commence this adversary proceeding.

The different estoppel theories espoused by MARAD do not convince this Court to hold in favor of MARAD because the Debt-

or's actions do not rise to the level necessary to warrant such equitable relief. MARAD claims that it was somehow misled by the Debtor's Disclosure Statement because the Debtor failed to make mention of a possible preference action against MARAD. The Debtor's Disclosure Statement stated:

> Except as specifically described in the Disclosure Statement, the Debtors are not aware of any claims for avoidance or recovery of property assertable under the Bankruptcy Code which would materially affect Distributions to Creditors and Interest Holders under the Plan, however, the Debtors have reserved the right to assert any such claims should the Debtor become aware of their existence. Any such claims shall become the property of Reorganized MII or the USL Reorganization Trust, as the case may be.

Disclosure Statement at 13. In support of its position, MARAD cites to *In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253 (Bankr.S.D.N.Y.1985), wherein Judge Buschman denied a debtor's preference action based on judicial estoppel. In *In re Galerie* the debtor represented to the court in its Disclosure Statement that pursuant to discussions with its counsel and accountants, it believed that there did not exist any preferences and fraudulent actions. The court in *In re Galerie*, found that at the time of the hearing on the adequacy of the disclosure statement, the debtor knew but did not disclose to the court the existence of the preferential transfer which it intended to avoid. Unlike in *In re Galerie*, the undisputed facts before this Court do not show that the Debtor filed its Disclosure Statement knowing that the Assignment to MARAD was a possible preferential transfer and that it intended to avoid said transfer. Moreover, in the Disclosure Statement the Debtor did in fact specifically reserve the right to pursue preferential transfers that came to its attention. There has not been any concealment by the Debtor in this case. What has occurred is that prior to commencing the action to avoid the Assignment, the Debtor was not aware that it had before it a possible preference cause of action. The possibility of a preference cause of action is not addressed in the Stipulation. MARAD did not seek protection by requesting that the Debtor agree to not commence a preference action pending court approval of the Stipulation. When MARAD entered into the Stipulation and decided to rely on it and not take any further actions in the case, MARAD took a calculated risk that the Debtor would, prior to court approval of the Stipulation, become aware of the possible preferential nature of the Agreement and take appropriate action. MARAD was not an innocent party duped by the Debtor into foregoing any of its rights. In fact, if MARAD was truly not aware of the possible preference action, then neither party was mislead because neither purposely concealed anything from the other. This Debtor has not committed the kind of egregious and dishonest acts of which the debtor in *In re Galerie* was guilty.

### Conclusion

In accord with this opinion, the Debtor's motion for summary judgment is granted and MARAD's motion for summary judgment is denied.

The Debtor is directed to settle an Order on five (5) days' notice consistent with this opinion.